Filed 5/5/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.V.,<br><br>        Defendant and Appellant. | A137348<br><br>(Alameda County<br>Super. Ct. No. OJ11018154) |

M.V., a minor, appeals from an order of the juvenile court dismissing dependency jurisdiction under Welfare and Institutions Code section 300,[1] declaring her to be a ward of the court pursuant to section 602, and placing her in out-of-home care. Specifically, M.V. identifies numerous bases for error in the juvenile court's decision under section 241.1 to make her a ward of the court rather than continuing her as a juvenile court dependent. M.V. also advances several reasons why the negotiated plea agreement on which her declaration of wardship was based should be set aside. We affirm.

## I.  BACKGROUND

On October 22, 2012, the Alameda County District Attorney's Office (District Attorney) filed a wardship petition pursuant to section 602 alleging that M.V. (then 15 years old) had loitered in a public place with the intent to commit prostitution (Pen. Code, § 653.22) and had agreed to engage in an act of prostitution (Pen. Code, § 647, subd. (b)).

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. All rule references are to the California Rules of Court.

The police report filed in connection with this matter described the incident upon which these allegations were based as follows: On October 19, 2012, two police officers spoke with an individual in the parking lot of the Islander Motel in Hayward, a venue known for prostitution activity. The man admitted that he was at the motel to meet a prostitute whom he had contacted through a magazine advertisement. He further stated that, while in the motel room with the prostitute, she received a phone call informing her that the police were in the parking lot and that he should leave. Subsequently, when M.V. exited the motel room, the man identified her as the prostitute. The police then contacted M.V., and the minor admitted to being at the motel for prostitution. Further, she identified a "friend" waiting for her nearby as her pimp. As a result, this individual—who admitted that he knew the minor—was taken into custody on a host of charges, including felony pimping (Pen. Code, § 266h, subd. (a)), and felony pandering involving a minor (Pen. Code, § 266i, subd. (b).)

At the detention hearing on October 23, 2012, the court appointed counsel for M.V., and the minor submitted to continued detention at the juvenile justice center. It was also noted that M.V. was a current juvenile court dependent and that her "dual status" would be considered in connection with the disposition in her 602 matter. Thereafter, M.V. agreed to admit to the loitering charge in exchange for dismissal of the prostitution allegation. Jurisdiction was established on this basis on October 31, 2012, with the juvenile court finding the minor to be a person described by section 602. Since M.V. was also a dependent minor under section 300, the court ordered that a report be prepared pursuant to section 241.1 to aid in determining which status—dependent or ward—would be most appropriate for the minor going forward.

M.V.'s involvement with the juvenile court began almost a year before her 602 petition was filed, when Alameda County Social Services (the Agency) filed a juvenile dependency petition with respect to the minor, alleging that she came within the dependency jurisdiction of the juvenile court under subdivisions (c) and (g) of section 300. Specifically, the petition averred that the then-14-year old minor had been hospitalized for psychiatric issues four times over the previous two years. Nancy V., the

2

minor's mother, was unwilling to provide further care or support for M.V. due to her suicidal ideation and aggressive behavior. Further, the minor's father had a history of substance abuse and incarceration and was unavailable to care for M.V.

The minor's relationship with her mother is a troubled one and has been variously described as "complex," "strained," "extremely volatile," and, by the minor's own admission, "not the best." Nancy V. has long-term mental health issues and has stated that she is both bipolar and has borderline personality disorder. In addition, she reports that the minor has received a number of mental health diagnoses, including depression, oppositional defiance, ADHD, bipolar, and borderline personality. Further, both M.V. and her mother have a history of substance abuse and treatment. M.V. has reported daily marijuana use and a history of ecstasy, alcohol, and oxycodone abuse. She has completed two inpatient drug treatment programs.

The minor's most recent psychiatric hospitalization occurred on December 15, 2011, when she was committed pursuant to section 5150 after she attempted to stab her 26-year old step-brother with a knife and talked about hanging herself.[2] In addition, the minor hit her mother with some wood from a broken picture frame. During this hospitalization, Nancy V. refused to participate in family meetings and visited the minor only once, on Christmas day for 15 minutes. She did not bring a gift. In addition, Nancy V. refused to pick the minor up upon her release from the hospital on December 26 and stated that she would "rather go to jail" than have the minor returned to her care.

M.V. has experienced significant trauma in her young life. When she resided with her father during her early years, he would engage in drug dealing in front of her. There are suspicions that the minor was sexually abused when she was seven years old. In

---

[2] Pursuant to subdivision (a) of section 5150, "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services. . . ."

addition, in March 2010, her 23-year old step-brother—with whom she was quite close—passed away due to complications from diabetes. In approximately April 2011, M.V. was raped in an incident that was possibly related to sexual exploitation. Finally, shortly before her dependency action was filed, in November 2011, Nancy V. became engaged and moved her fiancé into the family home. The minor felt abandoned by her mother, who admitted to spending much of her time with her fiancé. In addition, the minor felt that Nancy V. had failed to protect her from an older step-brother, who called her derogatory names and tried to seduce her. According to Nancy V., this step-brother may also have psychiatric problems.

M.V. was arrested three times in the months prior to her detention under the dependency statutes. On both September 7 and October 5, 2011, she was arrested for misdemeanor possession of marijuana on school property. The minor successfully completed diversion with respect to each incident. Additionally, on November 2, 2011, M.V. was arrested for misdemeanor battery. This matter was closed with a reprimand. When she attended school, the minor had an Individualized Education Plan (IEP) and received special education services pursuant to AB 3632 for emotional disturbance. M.V. is reported to do well in school when she is present and has been described academically as "very capable of completing her work."

The minor was detained in foster care at detention hearings on December 29 and 30, 2011. On January 18, 2012, the minor was removed from her first foster home due to solicitation activity. Thereafter, at the combined jurisdiction and disposition hearing on February 1, 2012, both parents submitted to jurisdiction on an amended petition, the minor was found to be a person described by subdivisions (c) and (g) of section 300, and the court declared M.V. to be a dependent child of the juvenile court. Reunification services were ordered for both parents.

A month later, in March 2012, M.V. received a seven-day notice that she would need to leave her second foster placement due to behavioral problems. Nancy V. advocated that M.V. be placed in a locked residential facility, despite the fact that the minor's behavior did not warrant such a restrictive placement. Ultimately, M.V. was able

to be stabilized in this foster home, and the notice was withdrawn. However, on April 23, 2012—after a family therapy session with her mother "went very bad"—the minor went AWOL from her foster placement for approximately three weeks. According to M.V., she "met a guy" who got her into prostitution. She went with him to Los Angeles and prostituted there as well. While in Los Angeles, another man told her that he would take care of her and that she should not be prostituting. She went with this man by bus to Phoenix and then to Dallas, where she was eventually located by the police. After destroying property while in juvenile hall in Texas, M.V. was detained in a psychiatric facility until her social worker flew to Dallas and retrieved her.

Upon her return to California, the minor spent several weeks at the assessment center awaiting a new foster home as her behavior problems made her difficult to place. Ultimately, she was transferred to foster care in May 2012, but was asked to leave less than a month later for stealing. M.V. entered her fourth foster home on June 15, 2012. In July 2012, at the six month review in her dependency action, reunification efforts were continued for both parents. The social worker opined that "the parents need to demonstrate that they are willing and able to improve their parent/child relationship with [M.V.] and demonstrate they can safely parent [the minor]." Progress towards reunification at that point was minimal as the father had only recently been released from jail and the minor and her mother continued to struggle and blame each other for their problems.

M.V. went AWOL from her fourth foster placement on September 5, 2012. According to the minor's mother, M.V. had been visiting her home a few days earlier over the Labor Day weekend when she left to go prostitute. M.V. was then placed in a group home on September 11, 2012, but left "out of impulse" on October 16, 2012. She admits that, after leaving the group home, she was staying in various hotels and prostituting herself. Finally, on October 19, 2012—as discussed in detail above—M.V. was arrested on prostitution charges in the incident that formed the basis for the wardship petition in this case.

5

On November 28, 2012, the juvenile court held a hearing to determine the appropriate disposition for the minor, including resolution of her dual status as both a dependent and a ward. Both the Agency and the Alameda County Probation Department (Probation) recommended in their assessment filed pursuant to section 241.1 that M.V. be adjudged a ward and that her dependency case be dismissed. Specifically, the report concluded that there was "no placement plan that would meet this minor's needs" through the dependency system. M.V.'s dependency counsel, in contrast, submitted a letter and appeared at the hearing to argue in favor of continued dependency. The minor's 602 attorney and the District Attorney also argued in favor of maintaining M.V.'s 300 status. At the conclusion of the hearing, the juvenile court stressed its concern about the minor's "level of dangerous activity" and indicated the need for a placement "that's more secure where we can keep her there." The court then adopted the joint recommendation of Probation and the Agency, adjudged M.V. a juvenile court ward, dismissed the minor's dependency action, and referred the minor to Probation for out-of-home placement. A timely notice of appeal was filed on December 13, 2012.

## II. DUAL JURISDICTION ISSUES

### A. *Statutory Framework and Standard of Review*

A child that has been abused or neglected falls within the juvenile court's protective jurisdiction under section 300 as a "dependent" child of the court. In contrast, a juvenile court may take jurisdiction over a minor as a "ward" of the court under section 602 when the child engages in criminal behavior. (*In re W.B.* (2012) 55 Cal.4th 30, 42-43 (*W.B.*); *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1123 (*D.M.*).) As a general rule, a child who qualifies as both a dependent and a ward of the juvenile court cannot be both. (§ 241.1, subd. (d); *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1012, 1015 (*Marcus G.*).)[3] Instead, section 241.1 sets forth the procedure that the juvenile court

---

[3] As of 2005, under certain statutorily enumerated circumstances, the probation department and the child welfare department of a county, in consultation with the presiding judge of the juvenile court, may create a written protocol permitting a child to be "dual status"—that is, both a dependent child and a ward of the court. (§ 241.1,

6

must follow when faced with a case in which it may have dual bases for jurisdiction over a minor.

Pursuant to section 241.1, whenever it appears that a minor may fit the criteria for both dependency and wardship, "the county probation department and the child welfare services department shall . . . initially determine which status will serve the best interests of the minor and the protection of society." The assessment of a minor under section 241.1 is statutorily required to include, at a minimum, consideration of the following eight factors: (1) the nature of the referral; (2) the age of the minor; (3) the prior record of the minor's parents for child abuse; (4) the prior record of the minor for out-of-control or delinquent behavior; (5) the parents' cooperation with the minor's school; (6) the minor's functioning at school; (7) the nature of the minor's home environment; and (8) the records of other agencies that have been involved with the minor and his or her family. (§ 241.1, subd. (b)(2).) This statutory mandate has been augmented by rule 5.512, which requires the joint assessment under section 241.1 to be memorialized in a written report. Further—in addition to the eight factors set forth in section 241.1 that must be considered in any such joint assessment—rule 5.512 demands evaluation of four additional items: (1) the history of any physical, sexual, or emotional abuse of the child; (2) any services or community agencies available to assist the child and his or her family; (3) a statement by any counsel currently representing the minor; and (4) a statement by any Court Appointed Special Advocate (CASA) currently appointed for the child. (Rule 5.512(d).) Once the recommendations of both departments are presented to the juvenile court, it remains for the court to "determine which status is appropriate for the minor." (§ 241.1, subd. (a); see also rule 5.512(g) [court must make a determination regarding the appropriate status of the minor and must state its reasons on the record or in a written order].)

---

subd. (e); see also Assem. Bill No. 129 (2003-2004 Reg. Sess.) § 1.) There is no indication in the record, however, that such a protocol has been adopted in Alameda County or that dual status was a possibility for this minor. (See generally *W.B., supra,* 55 Cal.4th at pp. 46-47.)

We review the juvenile court's determination under section 241.1 for abuse of discretion. (*In re Joey G.* (2012) 206 Cal.App.4th 343, 346 (*Joey G.*).) "To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice." (*Ibid*.) Throughout our analysis, we will not lightly substitute our decision for that rendered by the juvenile court. Rather, we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them. (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395.)

**B.     *Timeliness of Section 241.1 Assessment***

As a preliminary matter, M.V. contends that the section 241.1 assessment in these proceedings was untimely and, specifically, that the juvenile court violated her due process rights by holding the jurisdictional hearing in her 602 matter before completion of the section 241.1 report. Although it does not speak in terms of a written report, subdivision (a) of section 241.1 does state that a joint recommendation regarding status should "be presented to the juvenile court with the petition that is filed on behalf of the minor." We have previously construed this statement to mean that the report should be filed in connection with the later petition—that is, the petition that creates the potential for dual jurisdiction. (*Marcus G., supra*, 73 Cal.App.4th at p. 1013.) Rule 5.512 similarly states that, "[w]henever possible, the determination of status must be made before any petition concerning the child is filed" (rule 5.512(a)(2)) and that the "assessment must be completed as soon as possible after the child comes to the attention of either department" (rule 5.512(a)(1)). In addition, rule 5.512 is quite specific regarding the timing for the actual assessment report: "If the child is detained, the hearing on the joint assessment report must occur as soon as possible after or concurrent with the detention hearing, but no later than 15 court days after the order of detention and before the jurisdictional hearing. If the child is not detained, the hearing on the joint assessment must occur before the jurisdictional hearing and within 30 days of the date of

8

the petition." (Rule 5.512 (e).)[4]  Notice of the hearing—including a copy of the joint assessment report—must be provided to various interested parties at least five calendar days before the hearing.  (Rule 5.512(f).)

Here, the District Attorney filed the juvenile wardship petition on October 22, 2012, after the minor had previously been declared a juvenile court dependent.  At the detention hearing on October 23, 2012, the court announced on the record that M.V. was a "dual status" minor, and Probation's intake report filed with the court on that same date stated that M.V. had a "300 History" and that her "current case worker" had been notified.  Further, Valerie Patton, the 241.1 liaison, indicated that the "241" issue would be handled along with disposition by another department, but that everything prior to disposition could proceed before the current juvenile court judge.  Thus, at the detention hearing, the minor's court-appointed counsel was aware not only of the minor's dual status, but also of the court's plan to defer resolution of the 241.1 issue until disposition. Despite this knowledge, counsel failed either to request that a section 241.1 assessment be conducted before the jurisdictional hearing or to object to the court proceeding on the section 602 petition without such an assessment.  Similarly, at the jurisdictional hearing on October 31, 2012, the juvenile court judge accepted the minor's admission, found her to be a person described by section 602, referred the case for a 241.1 report, and set the matter for disposition, all without any objection from minor's counsel.  Thereafter, a section 241.1 assessment was filed with the court on November 26, 2012, and was

---

[4] We note that at least one commentator has indicated that the timeframes set forth in Rule 5.512(e) may be contrary to the best interests of the minor and the protection of society and therefore void as inconsistent with the intent of section 241.1.  (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2013) § 3.27[2], p. 3–52 [citing *California Court Reporters Assn. v. Judicial Council of California* (1995) 39 Cal.App.4th 15, 24-26].)  This is because a decision to terminate one status should not be made until after a determination that the jurisdictional allegations supporting the alternate status are true. (*Id.* at p. 3–51.)  As is pertinent to the present matter, "[s]ince the full nature of the delinquency allegations may not become clear until after they have been litigated and the juvenile court may or may not find those allegations true," there may be "substantial merit" to deferring the 241.1 determination until after the jurisdiction hearing in the appropriate case. (*Id.* at pp.  3–51-3–52.)

9

considered in connection with the November 28 combined disposition and 241.1 hearing. Given these facts, it is clear that the section 241.1 assessment in this case was not provided within the timeframes contemplated by rule 5.512. Equally clear, however, is that the minor has forfeited any right to complain about the timeliness of the assessment by failing to object in the juvenile court to the lateness of its preparation.[5]

Contrary to appellant's assertion, the fact that section 241.1 imposes a "mandatory" statutory duty does not preclude the application of the forfeiture rule. (See § 241.1, subd. (a) [241.1 recommendations "shall be presented to the juvenile court with the petition . . . ."]; see also § 15 ["shall" is mandatory].) Rather, courts have repeatedly held that a party's failure to object forfeits appellate review of the adequacy of—or the failure to prepare—mandatory assessment reports in juvenile proceedings. (See, e.g., *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [failure to prepare section 366.22 assessment waived by failure to object despite that provision's mandatory language] (*Dakota S.*); *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-413 [inadequacy of mandatory adoption assessment under subdivision (i) of section 366.21 waived by failure to object] (*Crystal J.*); see also *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [similar waiver of challenge to mandatory adoption assessment].) Indeed, "[a]s some of these courts have noted, any other rule would permit a party to trifle with the courts. The party could deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.)

We also reject the minor's argument that failure to provide a section 241.1 assessment and recommendation at the time that the 602 petition was filed in this matter

---

[5] On the initial date set for disposition, November 14, 2012, minor's 602 counsel did object to Probation's request for a continuance because it had failed to complete the 241.1 report. The basis for his objection was section 702, which requires disposition within 10 judicial days of the jurisdictional finding when a minor is detained. Minor's 300 counsel also noted his concern "that there's not a report for today." At the point that both of these objections were made, however, jurisdiction had already been established. Thus, these later objections to the continuance of the dispositional hearing are not relevant to the issue before us.

10

somehow deprived the delinquency court of jurisdiction to proceed.  M.V. correctly notes the language of section 304 which states that once a 300 petition has been filed and a "child is under the jurisdiction of the juvenile court all issues regarding his or her custody shall be heard by the juvenile court."  (See also rule 5.620(a).)  However, a careful reading of the full text of section 304 makes clear that this grant of exclusive jurisdiction was meant to circumscribe the authority otherwise granted to the superior court to make custody orders in family law matters or to establish probate guardianships.[6]  The statute is silent regarding issues of dual jurisdiction *within* the juvenile court.

M.V. also cites to case law stating that "[w]hen . . . a minor qualifies as both a dependent and a ward of the juvenile court, the Legislature has declared that a minor cannot simultaneously be both."  (*Marcus G., supra,* 73 Cal.App.4th at p. 1012; see also *Joey G., supra,* 206 Cal.App.4th at p. 347.)  There is no indication, however, that the Legislature intended this prescription to be jurisdictional.  Rather, section 241.1 clearly contemplates situations when more than one juvenile court will simultaneously and appropriately maintain jurisdiction over a minor.  For instance, when a recommendation

---

[6]  Section 304 provides in full: "After a petition has been filed pursuant to Section 311, and until the time that the petition is dismissed or dependency is terminated, no other division of any superior court may hear proceedings pursuant to Part 2 (commencing with Section 3020) of Division 8 of the Family Code regarding the custody of the child or proceedings under Part 2 (commencing with Section 1500) of Division 4 of the Probate Code, except as otherwise authorized in this code, regarding the establishment of a guardianship for the child.  While the child is under the jurisdiction of the juvenile court all issues regarding his or her custody shall be heard by the juvenile court.  In deciding issues between the parents or between a parent and a guardian regarding custody of a child who has been adjudicated a dependent of the juvenile court, the juvenile court may review any records that would be available to the domestic relations division of a superior court hearing that matter.  The juvenile court, on its own motion, may issue an order as provided for in Section 213.5, or as described in Section 6218 of the Family Code.  The Judicial Council shall adopt forms for these restraining orders.  These form orders shall not be confidential and shall be enforceable in the same manner as any other order issued pursuant to Division 10 (commencing with Section 6200) of the Family Code.

This section shall not be construed to divest the domestic relations division of a superior court from hearing any issues regarding the custody of a child when that child is no longer a dependent of the juvenile court."

regarding status is presented to one juvenile court under subdivision (a) of section 241.1, notice of that recommendation must be given to "[a]ny other juvenile court having jurisdiction over the minor." (§ 241.1, subd. (a); see also rule 5.512(f) [requiring that notice of hearing and a copy of the 241.1 assessment report be provided to "any other juvenile court having jurisdiction over the child"].) Moreover, as stated above, the Legislature amended section 241.1 in 2005 expressly to allow for the dual exercise of juvenile court jurisdiction over a minor under the terms of a locally adopted protocol. (§ 241.1, subd. (e); see also Assem. Bill No. 129 (2003-2004 Reg. Sess.) § 1.)[7] Any such protocol must include a "provision for ensuring communication between the judges who hear petitions concerning children for whom dependency jurisdiction has been suspended while they are within the jurisdiction of the juvenile court pursuant to Section 601 or 602." (§ 241.1, subd. (e)(3).) Further, under such circumstances, "[i]t is the intent of the Legislature that judges, in cases in which more than one judge is involved, shall not issue conflicting orders." (§ 241.1, subd. (e)(5).) The Legislature thus clearly understands that there are situations where dual juvenile court jurisdiction may legitimately be exercised in the best interests of a minor. Here, we recognize one such circumstance and hold that continued jurisdiction by both the dependency court and the delinquency court was appropriate until a determination under section 241.1 was made.

Nor do we see any error in the timing of the 241.1 assessment as a violation of due process and therefore not subject to forfeiture. (See *In re Janee J.* (1999) 74 Cal.App.4th 198, 208-209 (*Janee J.*).) In the dependency context, due process may be implicated where a required investigative report is completely omitted. (*Crystal J., supra,* 12 Cal.App.4th at p. 413.) However, where "the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and *does* address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process." (*Ibid.*) Here, a 241.1 report was prepared and available prior to the court's noticed 241.1 hearing and did address the

---

[7] On our own motion, we take judicial notice of these and all other official legislative acts cited herein. (See Evid. Code, §§ 452, subd. (c), 459.)

principal question at issue. Further, the report was considered by the juvenile court—along with argument by the parties regarding the report's recommendation—before the court announced its 241.1 decision. Under such circumstances, we do not perceive any lateness in the report's preparation to be a defect that fundamentally undermined the statutory scheme such that the minor was unable to avail herself of its protections. (Compare *Janee J., supra,* 74 Cal.App.4th at p. 208.)

In sum, neither due process nor any other argument advanced by the minor provides a basis for the relaxation of the forfeiture rule in this case. Thus, M.V. may not challenge the timeliness of the section 241.1 assessment in this appeal.

## C.    *Adequacy of Section 241.1 Assessment*

M.V. also argues that the 241.1 assessment prepared in this case was deficient because it failed adequately to address at least four specific areas required by statute and/or court rule: (1) the history of any physical, sexual, or emotional abuse of the child; (2) the prior record of the minor's parents for child abuse; (3) the nature of the child's home environment; and (4) the history of involvement of any agencies or professionals with the child or the child's family. (§ 241.1, subd. (b)(2); rule 5.512(d)(3), (4), (8) & (9).) The minor further contends that the report improperly failed to explore the possibility of higher-level dependency placements.[8] We conclude that neither assertion provides grounds for reversal of the juvenile court's 241.1 determination.

For instance, to the extent that discussion of the four required elements identified by the minor was inadequate in the 241.1 report at issue, we find any such error harmless. "When a parent challenges an assessment report as inadequate, the reviewing court evaluates any deficiencies in the report in view of the totality of the evidence in the appellate record." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 591; see also *Crystal J., supra,* 12 Cal.App.4th at p. 413 [deficiencies in report insignificant in light of the

---

[8] In support of her arguments, appellant counsel cited to, among other things, the minor's court-ordered psychological evaluation. As this document was not before the juvenile court at the time it made its 241.1 determination, we decline to consider it in connection with these or any of appellant's other contentions.

totality of evidence before the court, including other reports and live testimony].)  Here, since the vast majority of the evidence that the minor complains was lacking in the 241.1 assessment was before the court from other sources, any technical deficiencies in the assessment were harmless.

Specifically, minor's dependency counsel submitted a letter to the court which included much of the minor's prior history, including her mother's significant mental health issues, the minor's own mental health problems, the minor's dependency involvement, and her "complex and strained" relationship with her mother.  The letter further detailed M.V.'s history of "grief, trauma, and loss" such as the death of an adult sibling to whom she was extremely close, allegations of attempted sexual and verbal abuse by another adult sibling, issues involving her mother's failure to protect the minor, and the minor's feelings of rejection in the wake of her mother's recent engagement.  In addition, the probation report detailed the minor's substance abuse history, her father's repeated incarceration and substance issues, a list of prior Agency referrals for the family (most of which had been evaluated out without investigation), and the minor's sexual abuse history.  Also, the minor's involvement with Bay Area Women Against Rape (BAWAR) and her individual therapy through Westcoast Children's Clinic were both discussed in court reports issued by those agencies as well as in dependency counsel's letter.  Thus, the totality of the evidence before the juvenile court was sufficient for purposes of section 241.1.[9]

Moreover, with respect to the issue of placement, the 241.1 report indicated that the minor had a history of absconding from her 300 placements, including from a structured group home setting.  Prior to the group home placement, the minor lived in

---

[9] Citing *Joey G., supra,* 206 Cal.App.4th at p. 349, M.V. also argues that the 241.1 report in this case failed to specify how each of the factors mentioned in the report "favored dependency or wardship."  We discern no requirement in either section 241.1 or rule 5.512 that compels this type of individualized assessment of the mandatory report elements.  However, to the extent that any such analysis of the factors presented was required, the minor has waived this issue by failing to raise it in the juvenile court. (See *Dakota S., supra,* 85 Cal.App.4th at p. 502; *Crystal J., supra,* 12 Cal.App.4th at pp. 411-413.)

14

four different foster homes from which she either went AWOL or was asked to leave. All of this occurred during a time span of less than one year. Given her history of running away from placements, the Agency was unable to treat her behavioral or mental health problems. The report concluded that there was "no placement plan that would meet this minor's needs" through the dependency system. At the 241.1 hearing, M.V.'s dependency counsel argued that higher-level dependency placements were available which could address all of the minor's particular needs and keep her safe. Agency counsel, however, disputed this assertion, stating that a higher-level placement had been tried and that the Agency was "fearful" that it would not be able to "keep her in one place on our side." Discussion of placement options in a 241.1 assessment is not expressly mandated by either section 241.1 or rule 5.512, although it arguably falls under rule 5.512(d)(10): "Any services or community agencies that are available to assist the child and his or her family." In the present case, we believe that the placement issue was adequately, if not exhaustively, addressed by the Agency. Further, minor's counsel was able to challenge the Agency's conclusions at the 241.1 hearing. Given these facts, we see no error.

**D.** *The Juvenile Court's Section 241.1 Determination*

At the conclusion of the 241.1 hearing in this matter, the juvenile court determined—in accordance with the recommendation of both Probation and the Agency—that M.V. should be adjudged a juvenile court ward and her dependency proceedings dismissed.[10] As stated above, once it has been established that a minor

---

[10] M.V.'s contention that respondent should be barred from arguing in support of the juvenile court's 241.1 determination under theories of judicial estoppel is easily discarded. " ' " 'Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [ ] The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. [ ] Application of the doctrine is discretionary.' " [ ] The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent;

meets the criteria for either dependency or wardship, the juvenile court is required by section 241.1 to "determine which status is appropriate for the minor." (§ 241.1, subd. (a).) When doing so, the juvenile court considers the recommendations of the county probation department and the child welfare services department as to "which status will serve the best interests of the minor and the protection of society." (*Ibid.*) We read this statute, within the context of the Juvenile Court Law generally, as granting broad discretion to the juvenile court when determining which status will best meet a particular minor's needs. (See § 202, subd. (b) [both delinquent and dependent minors shall receive "care, treatment, and guidance" that is "consistent with their best interest"]; *Joey G., supra,* 206 Cal.App.4th at p. 346 [juvenile court determination under section 241.1 reviewable only for abuse of discretion]; see also *In re Abdirahman S.* (1997) 58 Cal.App.4th 963, 969 [juvenile delinquency court has broad discretion to set conditions of probation for purpose of rehabilitation]; *In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104 [juvenile dependency court "has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion"].)

Despite the juvenile court's significant latitude in this area, appellant faults the court's choice of wardship over dependency on a number of grounds. First, she states that the court's focus on the minor's safety when making this decision was improper. We are not convinced. The juvenile court judge (along with virtually every other hearing participant) was understandably concerned with M.V.'s safety given her apparent naiveté and propensity for involving herself in dangerous situations. (See § 202, subd. (a) [the purpose of the juvenile court law is "to provide for the protection and safety of . . . each

---

and (5) the first position was not taken as a result of ignorance, fraud, or mistake." ' " (*People v. Castillo* (2010) 49 Cal.4th 145, 155, italics omitted.) Here, in the juvenile court, the District Attorney advocated for continuing the minor as a dependent. As M.V. concedes, this was not the successful position below. Even more importantly, however, respondent's current arguments are not "totally inconsistent" with the District Attorney's prior position. Advocating for a particular status in the juvenile court is simply not equivalent to maintaining that the juvenile court's decision was not an abuse of discretion or that appellant has forfeited certain arguments.

minor under the jurisdiction of the juvenile court . . . ."].)  The judge opined that, under a declaration of wardship, the minor could still pursue many of her stated goals— reunifying with family, finishing school, getting a job, and volunteering in the community.  At the same time, however, placement through probation would allow the minor to get some services and to get help in understanding the consequences of her actions.[11]  Indeed, the 241.1 recommendation adopted by the juvenile court was based largely on the Agency's admission that it had been ineffective in providing the minor with the services that she so clearly needed.  Given these facts, we see no abuse of discretion in the juvenile court's conclusion that the minor's interests—including her manifest need for a safe and secure placement—would best be served through the delinquency system.[12]

M.V. also complains that the juvenile court's 241.1 determination was defective because the delinquency court judge failed to review the minor's dependency file prior to determining her status as a ward.  Although respondent argues that the delinquency court's review of the dependency file can be inferred, the record is simply unclear on this

---

[11] Support for the juvenile court's conclusion can be found in the human trafficking literature:  "Attorneys and judicial officers have stated that sometimes incarceration may be the only alternative available to keep a youth safe. . . . [S]ome feel that a locked facility in which a victim can receive necessary services and guidance and, more importantly, be isolated from the trafficker, is the best option.  Some practitioners have called detention the 'best among worst choices' since young victims are often returned to the homes from which they fled or placed in nonsecure facilities, leading to increased risk of revictimization."  (Admin. Off. of the Cts., Center for Families, Children & the Cts., *Human Trafficking Cases in California's Courts: Successful Practices in the Emerging Field of Human Trafficking* (2012)  p. 14, fn. omitted (*Human Trafficking*).)

[12] Our conclusion is not inconsistent with *In re Natasha H.* (1996) 46 Cal.App.4th 1151, cited by M.V.  In that case, the juvenile court terminated its dependency jurisdiction over a minor who was a chronic runaway and failed to cooperate with the services offered to her.  (*Id.* at pp. 1153-1155.)  The appellate court reversed, holding that "misbehavior and lack of cooperation" are not appropriate grounds for termination of dependency where a minor remains in need of supervision.  (*Id.* at p. 1158.)  Here, obviously, the juvenile court did not "throw in the towel" and release the minor from all juvenile court supervision, but instead thoughtfully selected *the type* of juvenile court supervision most likely to meet the minor's unique needs.  (Compare *id.* at p. 1153.)

point. However, neither section 241.1 nor rule 5.512 requires judicial examination of the full dependency file. In fact, while section 241.1 requires that relevant "records of other agencies" be considered by Probation and the Agency in the development of their recommendation regarding a dual status minor (§241.1, subd. (b)(2)), the 241.1 report prescribed by rule 5.512 requires only "the history of involvement" of those agencies. This makes sense as a well-drafted 241.1 report should successfully summarize the minor's social history, including the impact of any previous abuse or neglect on current wrongdoing, that would otherwise be contained in the underlying records. (Rule 5.512(d); see also Bellinger, *"Can we Talk?" Facilitating Communication Between Dependency and Delinquency Courts* (2000) 21 J. Juv. L. 1, 24.) Of course, where the best interests of a child are at stake, it may well be prudent for the juvenile court to consider as much information as possible. However, review of the entire dependency file was not mandatory.

M.V. finally argues that the juvenile court's decision to declare her a ward and dismiss dependency was erroneous because—as a commercially sexually exploited minor—she should have been treated as a victim rather than a criminal.[13] Alameda County has specific statutory authority "to develop a comprehensive, replicative, multidisciplinary model to address the needs and effective treatment of commercially sexually exploited minors [CSECs] . . . ." (§ 18259, subd. (a).)[14] Alameda's voluntary

---

[13] Section 18259.3 defines a " 'commercially sexually exploited minor' " as "a person under 18 years of age who has been abused in the manner described in paragraph (2) of subdivision (c) of Section 11165.1 of the Penal Code [sexual exploitation], and who has been detained for a violation of the law or placed in civil protective custody on a safety hold based only on a violation of subdivision (a) or (b) of Section 647 [lewd conduct/prostitution] or subdivision (a) of Section 653.22 of the Penal Code [loitering with intent to commit prostitution]."

"Sexual exploitation" includes "[a]ny person who knowingly promotes, aids, or assists, employs, uses, persuades, induces, or coerces a child . . . to engage in, or assist others to engage in, prostitution . . . ." (Pen. Code, § 11165.1, subd. (c)(2).)

[14] For purposes of this opinion we use the acronym "CSEC" to refer to a "commercially sexually exploited minor" as defined in section 18259.3. Also relevant to M.V.'s situation are federal and state provisions regarding human trafficking. (See 22 U.S.C.

18

pilot project may include as a component "a diversion program reflecting the best practices to address the needs and requirements of arrested or detained minors who have been determined to be victims of commercial sexual exploitation." (*Id.*, subd. (c).) In 2011, the repeal date for the legislation authorizing the pilot project was extended from January 1, 2012, to January 1, 2017. (See Stats. 2011, ch. 51 (AB 799).)

There is scant information in the record regarding Alameda's CSEC program. However, the legislative history for AB 799 quotes a March 2011 progress report issued by the District Attorney which states that—as a result of the pilot project—it "has been able to develop a comprehensive system response that directs CSEC away from the criminal justice system and into programs offering specialized services essential for the stabilization, safety, and recovery of these vulnerable children." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 799 (2011-2012 Reg. Sess.) April 5, 2011, p. 4 (AB 799 Analysis).) Further, with respect to diversion, a new model program—Girls' Court—has been created as a "forum for the identification, recovery, and decriminalization of CSEC . . . ." (*Id.* at p. 5.)

"The mission of the Girls' Court is to provide a non-adversarial, trauma-informed courtroom that is focused on addressing the trauma, healing, and empowerment of young women through comprehensive case plans that address each young woman's unique challenges." (Alameda County Public Defender Web site <http://www.co.alameda.ca.us/defender/services/juvenile.htm#juv14> [as of April 29, 2014].) However, not all CSEC are eligible for inclusion in the Girls' Court diversion program. Between February 2009 and October 2010, for example, only half of the 100 CSEC identified "were amenable to diversion, meaning they were willing to receive

---

§ 7102(10) [defining sex trafficking as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act"]; (22 U.S.C. § 7102(9)(B); [characterizing a "severe" form of such trafficking as "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age"] Pen. Code, § 236.1, subd. (g) [state definition of human trafficking "equivalent to the federal definition of a severe form of trafficking"].)

services and did not have a juvenile history or other pending cases which would preclude their participation in a services only response." (AB 799 Analysis at p. 5.) As of January 2011, Alameda County was using a multi-disciplinary team model to conduct " 'Safety Net' " meetings in which identified CSEC were assessed to determine whether they were appropriate candidates for diversion. (*Id.* at p. 6; see also *Human Trafficking, supra,* at p. 13 [noting that, under Alameda's diversion program, "arrested youth *who qualify* are released to foster care, group homes, or their parents instead of going to juvenile hall," italics added].)

We agree with M.V. that there is evidence in the record supporting her status as a CSEC. As required by section 18259.3, the only charges underlying the 602 petition in this matter were prostitution (Pen. Code, § 647, subd. (b)) and loitering with the intent to commit prostitution (Pen. Code, § 653.22, subd. (a)), based on the minor's October 2012 arrest. Moreover, there is evidence that the minor was sexually exploited by the man she identified as her pimp on the date of her arrest. In addition, M.V. reported that she "met a guy who got her into prostituting" in April 2012 and that she traveled to Los Angeles with this individual and engaged in prostitution there. This occurrence provides further evidence of exploitation. And, in approximately April 2011, M.V. was raped in an incident that was possibly related to sexual exploitation. Indeed, virtually all of the participants at the 241.1 hearing acknowledged M.V.'s status as a CSEC. In addition, the evidence presented at the hearing included statements from the minor's BAWAR advocate and her therapist regarding her ongoing treatment for sexual exploitation. Finally, the juvenile court judge clearly recognized M.V.'s status as a CSEC, stating: "This is a Girls Court case. . . . [T]his does meet the criteria for our Girls Court."

Unfortunately for M.V.'s argument, however, her recognition as a CSEC is not the end of the inquiry. As we have previously stated, the juvenile court had broad discretion in determining which status—dependent or ward—would best meet M.V.'s needs. It is abundantly clear from the record that the juvenile court was aware of the minor's history of sexual exploitation and considered it when making its 241.1 determination. M.V. directs us to no authority, nor have we discovered any, mandating that her designation as

20

a CSEC exempt her completely from the purview of the delinquency court.[15]  Rather, under the Alameda program—while diversion or other "decriminalization" of a CSEC is permissible in the appropriate case—the juvenile court retains the authority to process a CSEC through the delinquency system when such a response is indicated for a particular minor.  Indeed, such a system may very well be in the best interests of these exploited children as it maximizes the tools available to the juvenile court in crafting a dispositional order most responsive to the circumstances of each individual CSEC.

In sum, we conclude that the court's reasons for its 241.1 determination are amply supported by the record, and that its decision to declare M.V. a ward of the court was not an abuse of discretion in light of the court's justifiable concern for her safety and the failure of all of her previous dependency placements.[16]

---

[15] In this regard—although not referenced by either party—we note that recently enacted subdivision (a) of section 1161 of the Evidence Code provides that "[e]vidence that a victim of human trafficking, as defined in Section 236.1 of the Penal Code, has engaged in any commercial sexual act as a result of being a victim of human trafficking is inadmissible to prove the victim's criminal liability for the commercial sexual act."  This provision was adopted by California voters in November 2012 as part of Proposition 35, also known as the Californians Against Sexual Exploitation (CASE) Act.  (Ballot Pamp., Gen. Elec. (Nov. 6, 2012) text of Prop 35 at pp. 100-101 (Prop. 35).)  Since a juvenile adjudication under section 602 is not a criminal conviction (See § 203; *W.B., supra,* 55 Cal.4th at p. 43.), the application of this new provision to juvenile delinquency proceedings is uncertain, a fact recently acknowledged by the Second District in *In re Aarica S.* (2014) 223 Cal.App.4th 1480.  We need not resolve this issue here, however, as the matter was neither raised in the court below nor briefed before this Court.  (Evid. Code, § 353, subd. (a) [admission of evidence may not be questioned on appeal absent objection in the trial court]; *In re Robert B.* (1985) 172 Cal.App.3d 763, 773 [same]; *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 776-777 [noting issue " 'doubly waived' " where not raised below or in opening or reply brief on appeal].)

[16] Before we leave this topic, we feel compelled to admonish respondent for the many comments made throughout its brief to the effect that M.V. is a "victim of her own dangerous willfulness" and that she "repeatedly exposed herself to being a sexually exploited minor."  These statements seriously misapprehend the nature of sexual exploitation and are not well taken.  As both state and federal law make clear, a minor's status as a sexually exploited youth operates independently of any notion that a minor has somehow consented to her own victimization.  (See Pen. Code, § 236.1, subd. (e)

## III. CHALLENGES TO UNDERLYING CONVICTION

At the October 31, 2012, jurisdictional hearing on M.V.'s 602 petition, the minor entered into a plea arrangement whereby she agreed to admit to count one of the petition (loitering with the intent to commit prostitution) in return for dismissal of count two (prostitution). Both the court and minor's counsel questioned M.V. regarding her understanding of the plea bargain and the rights that she was waiving. In addition, both minor's counsel and the prosecutor agreed that there was a factual basis for the plea. At the conclusion of this process, the juvenile court accepted the plea, found that there was a factual basis for the admission, found the count one allegations true, dismissed the count two allegations with facts and restitution open, and concluded that the minor was a person described by section 602.

M.V. now challenges this negotiated plea agreement on a number of grounds. First, she argues that the evidence was insufficient to support the loitering charge. Second, M.V. asserts that the juvenile court erred in finding that a factual basis supported her plea. Finally, the minor states that her 602 attorney's failure to identify and pursue these meritorious claims in the juvenile court amounted to ineffective assistance of counsel. We address each contention in turn.

### A.     *Sufficiency of the Evidence*

We first consider M.V.'s argument that insufficient evidence supported the charge to which she admitted in the juvenile court, loitering in a public place with the intent to commit prostitution in violation of section 653.22 of the Penal Code. The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials: We review the entire record in the light most favorable to the

["[c]onsent by a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section"]; 22 U.S.C. § 7102(10) [defining sex trafficking as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act"]; 22 U.S.C. § 7102(9) [characterizing a "severe" form of such trafficking as "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, *or in which the person induced to perform such act has not attained 18 years of age*," italics added].)

judgment to determine whether substantial evidence supports the charge, so that a reasonable trier of fact could find guilt beyond a reasonable doubt. (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540; *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1088-1089.) As a preliminary matter, however, respondent argues that we should not reach the merits of M.V.'s sufficiency claims because—by entering her admission in the juvenile court as part of a negotiated plea bargain—the minor waived any challenge to the sufficiency of the evidence on appeal.

The Juvenile Court Law gives a minor the option to admit the jurisdictional allegations of a petition alleging criminal conduct. (§ 657, subd. (b); Rule 5.778 [setting forth procedure for taking a juvenile admission to the allegations in a petition filed pursuant to section 602]; see also *In re Uriah R.* (1999) 70 Cal.App.4th 1152, 1158 [minor deemed intelligent enough to appreciate the consequences of admitting to having engaged in criminal behavior].) As a general matter, when a minor enters an admission as part of a negotiated plea agreement and does not later seek to withdraw that plea, the minor has forfeited the right to attack the terms of the bargain on appeal, including any challenge to the sufficiency of the evidence. (See *In re Travis J.* (2013) 222 Cal.App.4th 187, 194-196; *People v. Voit* (2011) 200 Cal.App.4th 1353, 1364 [admission waives appellate challenge to the sufficiency of the evidence] (*Voit*); *Ricki J. v. Superior Court* (2005) 128 Cal.App.4th 783, 792 [guilty plea "constitutes an admission of every element of the offense charged . . . and concedes the prosecution possesses admissible evidence sufficient to prove guilt beyond a reasonable doubt"] (*Ricki J.*).) Application of this forfeiture rule, however, is not absolute. An appeal is permitted, for instance, on the issue of whether the waiver of rights made upon entering a plea was knowingly, voluntarily, and intelligently made. (*Voit, supra,* 200 Cal.App.4th at pp. 1364-1365.) In addition, an appellant may successfully assert that his or her admission included a legal impossibility. (*People v. Soriano* (1992) 4 Cal.App.4th 781, 783 [plea to filing a forged instrument may be challenged when death certificate at issue did not qualify as an instrument].) Finally, relaxation of the general forfeiture rule may be appropriate in a rare case presenting an important legal issue. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293,

superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)

Here, M.V. has waived her right to contest the sufficiency of the evidence with respect to her loitering charge. Arguably, however, her contention that she was legally incapable of forming the requisite intent to commit prostitution could, if true, implicate the exceptions to forfeiture for legal impossibility and/or for presentation of an important legal issue. Because of this, and because analysis of the sufficiency issues she raises is otherwise relevant to the resolution of her two remaining arguments on appeal, we will consider the merits of her claims.

First, M.V. contends that the evidence was insufficient to support a finding that she intended to commit prostitution. To bolster this claim, she points to the laundry list of conduct evincing an intent to commit prostitution set forth in CALCRIM No. 1156 (2013) (which essentially restates subd. (b) of Pen. Code, § 653.22) and argues that she did not engage in any of this conduct.[17] M.V., however, fails to appreciate that both the jury instruction and the statute on which it is based expressly indicate that the factors described are non-exhaustive and are meant only to assist in establishing intent. (See Pen. Code, § 653.22, subd. (c) ["The list of circumstances set forth in subdivision (b) is

---

[17] Subdivision (b) of Penal Code section 653.22 provides in full as follows: "Among the circumstances that may be considered in determining whether a person loiters with the intent to commit prostitution are that the person:
(1) Repeatedly beckons to, stops, engages in conversations with, or attempts to stop or engage in conversations with passersby, indicative of soliciting for prostitution.
(2) Repeatedly stops or attempts to stop motor vehicles by hailing the drivers, waving arms, or making any other bodily gestures, or engages or attempts to engage the drivers or passengers of the motor vehicles in conversation, indicative of soliciting for prostitution.
(3) Has been convicted of violating this section, subdivision (a) or (b) of [Penal Code] Section 647, or any other offense relating to or involving prostitution, within five years of the arrest under this section.
(4) Circles an area in a motor vehicle and repeatedly beckons to, contacts, or attempts to contact or stop pedestrians or other motorists, indicative of soliciting for prostitution.
(5) Has engaged, within six months prior to the arrest under this section, in any behavior described in this subdivision, with the exception of paragraph (3), or in any other behavior indicative of prostitution activity."

not exclusive. . . . Any other relevant circumstances may be considered in determining whether a person has the requisite intent"]; CALCRIM No. 1156 (2013) ["This list of factors is not intended to be a complete list of all the factors you may consider on the question of intent. The factors are provided only as examples to assist you in deciding whether the defendant acted with the intent to commit prostitution"].)  In this case, where the minor, herself, admitted that she was at the hotel for the specific purpose of engaging in prostitution, intent has been unequivocally established, and these listed factors are irrelevant.

Next, the minor asserts that the evidence was insufficient to support a finding that she loitered in a public place in violation of Penal Code section 653.22.  M.V. concedes that the Islander Motel is a "public place" within the meaning of the statute.  (See Pen. Code, § 653.20, subd. (b) [defining public place to include a "building open to the general public"].)  However, she claims that there is no evidence that she "loitered" at the motel.  For purposes of establishing criminal conduct under Penal Code section 653.22, loitering means "to delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered."  (Pen. Code, § 653.20, subd. (c).)  In the instant case, the record reveals that M.V. arranged to meet the witness at the motel for the purpose of engaging in prostitution; that the motel was known to be a high prostitution area; that the minor arrived at the motel and spent a period of time in a room with the witness; that she advised the witness to leave the motel room after receiving a phone call disclosing that the police were in the parking lot; that the minor left the motel room some period of time after the witness exited; and that, after the police contacted her in a common area of the motel, M.V. admitted to being on site for purposes of prostitution.  Thus, M.V. admitted that she was not on the property for a lawful purpose, but instead for the express purpose of engaging in criminal behavior.  Moreover, "linger" is commonly defined as "to remain or wait long."  (Webster's 3d New Internat. Dict. (2002) p. 1316.)  Reviewing the record in the light most favorable to the judgment, we believe that the evidence in this case is sufficient to established that M.V. remained in and around the motel for the unlawful purpose of engaging in prostitution.

(Compare *People v. Pulliam* (1998) 62 Cal.App.4th 1430, 1432 [police observed Pulliam for 15-20 seconds in a high prostitution area; Pulliam was wearing revealing clothes and waved at a passing car; when approached she admitted to being there to engage in prostitution].)

Finally, M.V. avers that—as a minor—she was legally incapable of forming the requisite intent to commit prostitution.  In support of this claim, the minor cites to statutes and related case law involving statutory rape and other crimes based on sexual misconduct with children that generally operate without regard to consent.  As the Supreme Court summarized in *People v. Scott* (1994) 9 Cal.4th 331, 341-342:  "Above and beyond the protection afforded to all victims of sexual assault, the Legislature has determined that children are uniquely susceptible to 'outrage' and exploitation.  Hence, special laws on the subject of sex with children have been enacted.  They expand the kinds of acts which may be deemed criminal sexual misconduct, and they generally operate without regard to force, fear, or consent.  (See, e.g., [Pen. Code,] § 261.5 [sexual intercourse with nonspouse under 18], 266 [enticing female under 18 into prostitution], 266j [procuring child under 16 for lewd act], 267 [abducting person under 18 for prostitution], 285 [incest], 288.2 [distributing harmful materials to minor for sexual purpose], 288.5 [continuous abuse of child by resident molester].)"  (See also *People v. Soto* (2011) 51 Cal.4th 229, 238 (*Soto*) ["The Legislature has drafted the child molestation laws to make issues regarding the child victim's consent immaterial *as a matter of law* in these cases"].)   It is true that courts analyzing the availability of a consent defense under these statutes have, at times, talked in terms of the minor victim's inability to consent to sexual intercourse.  (See, e.g., *People v. Hernandez* (1964) 61 Cal.2d 529, 531 (*Hernandez*) [statutory rape]; *People v. Stratton* (1904) 141 Cal. 604, 606 (*Stratton*) [incest]; *People v. Verdegreen* (1895) 106 Cal. 211, 214 (*Verdegreen)* [statutory rape].)  However, these statutes operate to maximize the protection from sexual exploitation afforded to children by removing a potential defense that might otherwise relieve *a perpetrator* from criminal responsibility.  Thus, while relevant to our inquiry, we perceive a distinction between such situations and the question presented here:

26

Whether the minor, herself, can form the requisite intent and thus be held responsible as a perpetrator for engaging in prostitution or related sexual misconduct.

It is clear that a minor can *actually* consent to—that is voluntarily and willingly participate in—sexual activity. (See *Michael M. v. Superior Court* (1979) 25 Cal.3d 608, 614 (*Michael M.*) [By adopting statutory rape law "the Legislature necessarily acknowledged the obvious truism that minor females are fully capable of freely and voluntarily consenting to sexual relations. If this was not so, the charge brought in these cases would uniformly be one of forcible rape"].) Thus, the question becomes whether a minor in this state can *legally* consent to such behavior. (Compare *In re B.W.* (2010) 313 S.W.3d 818, 824 [clarifying difference between "the ability to factually agree to sex, which can have legal relevance in the treatment of the offender, with the legal capacity to consent, which is necessary to find that a person 'knowingly agreed' to engage in sexual conduct for a fee"].) In California, persons of all ages are generally deemed capable of committing crimes, except "[c]hildren under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." (Pen. Code, § 26.) When assigning culpability for crimes committed by minors which involve sexual activity, however, application of this otherwise relatively bright-line rule has been far from straightforward.

Early court interpretations of the rape statute, for instance, concluded that women under the age specified by that statute (14 at that time) were unable to consent to sexual intercourse as a matter of law.[18] (*People v. Tobias* (2001) 25 Cal.4th 327, 333 (*Tobias*), citing *Verdegreen, supra,* 106 Cal. 211.) By 1964, however, the Supreme Court concluded in *Hernandez* that a reasonable belief that a female was over the age of consent (i.e., over the age of 18) is a valid defense to statutory rape. (*Hernandez, supra,* 61 Cal.2d at pp. 535-536.) In reaching this conclusion, the court noted that "in one sense, the lack of consent of the female is not an element of the offense. In a broader sense, however, the lack of consent is deemed to remain an element but the law makes a

---

[18] The age of consent specified in the rape statute was 14 in 1895 and 16 in 1904. It was raised to 18 in 1913. (See *Tobias, supra,* 25 Cal.4th at pp. 332-333.)

conclusive presumption of the lack thereof because she is presumed too innocent and naive to understand the implications and nature of her act." (*Id.* at p. 531.) The court confirmed that "actual" consent from a female *known to be under age* would not be a viable defense. (Id. at p. 536.)

Then, in 1970, the Legislature removed sex with a minor from the definition of rape (Pen. Code, § 261) and created instead the separate crime of unlawful sexual intercourse with a minor (Pen. Code, § 261.5). (See *Tobias, supra,* 25 Cal.4th at p. 333.) In upholding the constitutionality of this new section 261.5 against an equal protection challenge, the high court noted in *Michael M.* that the "statute makes no statement about the girl's ability to consent" and "emphatically rejected" the contention that its decision created "adverse inferences concerning the capacity of minor females to make intelligent and volitional decisions." (*Michael M., supra,* 25 Cal. 3d at p. 614.) Rather, the court based its decision on the state's compelling interest in curtailing teenage pregnancy. (*Id.* at pp. 611-612.)

Thereafter, in 2001, the Supreme Court unanimously endorsed "a consistent line of cases dating back nearly 75 years" which repeatedly held that "a minor who has incestuous sexual intercourse with an adult is not guilty of incest, even if the minor is older than 14 and participates voluntarily in the incestuous act." (*Tobias, supra,* 25 Cal.4th at pp. 329, 332.) Although the incest statute makes no express exception for minor participants, the case law interpreting the statute had consistently held both that consent is not an element of incest and that a minor cannot *legally* consent to sexual intercourse (regardless of any actual consent). (*Id.* at pp. 332-333, citing *Stratton, supra,* 141 Cal. 604.) In *Tobias*, however, a majority of the high court concluded that—by changing the rape statute in 1970—the Legislature abrogated the rule that a girl under 18 is in all cases incapable of giving legal consent to sexual activity. Rather, citing to *Michael M.*, the court opined that "the Legislature implicitly acknowledged that, in some cases at least, a minor may be capable of giving legal consent to sexual relations." (*Tobias, supra,* 25 Cal.4th at p. 333, fn. omitted.) Thus, the consent construct upon which the previous incest cases had been based was "undermined." (*Id.* at p. 334.)

28

Moreover, the court noted a number of cases where minors as young as 11 had been held responsible for a variety of sex-related crimes. (*Ibid.* [listing cases].) Against this backdrop, the *Tobias* majority abandoned the whole notion of legal consent and held that a refusal to hold a minor legally culpable for having incestuous sexual intercourse "need not . . . turn on the minor's categorical inability 'to give legal assent' to sexual intercourse." (*Ibid.*) Rather, it upheld the result, if not the reasoning, of the prior precedent based on the existence of a "comprehensive legislative scheme establishing that the minor is a *victim* of, not an accomplice to, the incest." (*Id.* at pp. 334-337.)[19]

Like the incest statute considered in *Tobias*, the wording of the prostitution statutes is unambiguous and makes no express exception for minors. (Pen. Code, §§ 647, subd. (b), 653.22.) Here, however—in contrast to *Tobias*—there is no long history interpreting the prostitution statutes to conclude that all minors up to the age of 18 are incapable of forming the legal intent to engage in prostitution or "comprehensive legislative scheme" requiring that all such minors be treated as victims. Rather, with respect to crimes involving sexual acts, the Supreme Court has recently acknowledged a "long-standing presumption that children *under age 14* cannot give legal consent to sexual activity." (*Soto, supra*, 51 Cal.4th at pp. 245, 248, fn. 11 [holding that lack of consent is not an element of, and therefore consent is not a defense to, aggravated lewd conduct with a minor under the age of 14 in violation of subdivision (b) of Penal Code section 288].)[20] Given this precedent, it would be difficult to argue that minors under age

---

[19] In his concurring opinion, Chief Justice George disagreed that the statutory changes made by the Legislature in 1970 altered the established principle that a minor cannot *legally* consent to sexual intercourse. Rather, he opined that the Legislature had merely "indicated that a minor *actually* can consent to (i.e., voluntarily participate in) sexual intercourse." (*Id.*. at p. 340 (conc. opn. of George, C.J.).)

[20] Indeed, in concluding that reasonable mistake as to the female's age was a defense to a charge of statutory rape, the Supreme Court in *Hernandez* was clearly influenced by the change in the "age of consent" under the rape statute from 14 to 18. (*Hernandez, supra,* 61 Cal.2d at pp. 533, 536.) And, twenty years later, in *People v. Olsen* (1984) 36 Cal.3d 638, the high court held that a good faith, reasonable mistake as to age was not a defense to a charge of lewd or lascivious conduct with a minor under the age of 14 (See Pen.

14 could legally form the intent to commit prostitution. (Compare *In re B.W., supra,* 313 S.W.3d 818, 821 [ruling of Texas Supreme Court that a child under 14 years of age cannot be prosecuted for prostitution because "in Texas, 'a child under fourteen cannot legally consent to sex' "]; but see *Tobias, supra,* 25 Cal.4th at p. 334 [listing cases holding minors under 14 culpable for numerous sex-related crimes].)

With respect to minors aged 14 to 17 such as M.V., in contrast, no such presumption of incapacity to consent to sexual activity appears currently operative in this state.[21] In practice, minors clearly have been subject to prosecution for soliciting prostitution in violation of subdivision (b) of section 647. (See *In re Cheri T.* (1999) 70 Cal.App.4th 1400, 1403 [upholding 602 petition alleging solicitation under subdivision (b) of section 647 against sufficiency of evidence challenge]; *In re Elizabeth G.* (1975) 53 Cal.App.3d 725, 730 [violation of subdivision (b) of section 647 as set forth in 602 petition upheld against selective enforcement and sufficiency of evidence challenges].) Further, as described in *Tobias*, notions of legal capacity to consent applied when a minor is a victim (to foreclose a consent defense) do not seem to have been uniformly applied where a minor is the perpetrator. Rather, numerous minors have been held culpable for acts involving sexual misconduct. (See, e.g., *In re T.A.J.* (1998) 62 Cal.App.4th 1350, 1365 [minor may be charged with violation of Penal Code section 261.5 (unlawful sexual

---

Code, § 288, subd. (a).) In distinguishing *Hernandez*, the court noted that "[t]ime and again, the Legislature has recognized that persons under 14 years of age are in need of special protection" and found that the public policy considerations involved in protecting "children of tender years" were more substantial than those associated with statutory rape. (*People v. Olsen*, *supra*, 36 Cal.3d at pp. 646-649.)

[21] This view is not universal. (See Prop. 35, § 2 at p. 101 [noting in measure's findings and declarations that "[b]ecause minors are legally incapable of consenting to sexual activity, these minors are victims of human trafficking whether or not force is used"]; *Human Trafficking, supra,* at pp. 11, fn. omitted, 16 & 24, fn. 69 [citing Penal Code section 261.5 (unlawful sexual intercourse with a minor) and Penal Code section 267 (abduction of person under 18 for purposes of prostitution) as support for the contention that "youth charged with prostitution or solicitation in California can easily be detected as trafficking cases since youth under 18 do not have the ability to consent to sex under any circumstances in the first place"].)

intercourse with a minor)]; *In re Paul C.* (1990) 221 Cal.App.3d 43, 47 [minor can be found to have violated Penal Code section 288 (lewd or lascivious act on a child) with evidence of appropriate criminal intent]; see also *Tobias, supra*, 25 Cal.4th at p. 334 [listing cases].)[22]

In addition, in the sexual harassment context, a federal district court has cited *Tobias* as its basis for rejecting a claim that " 'a minor cannot legally consent to sexual intercourse with an adult.' " (*Doe v. Starbucks, Inc.* (C.D. Cal. 2009) 2009 U.S. Dist. LEXIS 118878, *20 [108 Fair Empl. Prac. Cas. (BNA) 153]; see also *Donaldson v. Department of Real Estate* (2005) 134 Cal.App.4th 948, 951, 961 [real estate license improperly revoked based on conviction of a sex crime involving a " 'non-consenting participant' " where 16-year-old victim willingly participated; presumption of nonconsent obsolete as discussed in *Tobias*].) And, indeed, if all minors under the age of 18 were deemed incapable of legally consenting to prostitution, Alameda's CSEC pilot program as crafted by the Legislature would be rendered a nullity, as no minor would ever meet the definition of a CSEC for purposes of potential diversion under the program. (See

---

[22] Of course, to the extent these crimes have been committed by minors under the age of 14, their prosecution based on compliance with section 26 of the Penal Code is difficult to square with the "long-standing presumption" recently acknowledged by the Supreme Court in *Soto* that "children *under age 14* cannot give legal consent to sexual activity." (*Soto, supra*, 51 Cal.4th at pp. 245, 248, fn. 11.) However, most of the cases citing the inability of a victim to consent to sexual activity have concluded, in addition, that lack of consent was not an element of the crime charged. (See e.g. *id.* at p. 245; *Tobias, supra*, 25 Cal.4th at pp. 332-333; *Michael M., supra,* 25 Cal.3d at p. 614; *Hernandez, supra,* 61 Cal.2d at p. 531; *Stratton, supra,* 141 Cal. at pp. 608-609.) Thus, the more prudent approach might be to uphold this precedent on these alternate grounds, scrap the notion of incapacity to consent, and handle minor perpetrators of sexual misconduct either in accordance with the dictates of Penal Code section 26 or—to the extent that a "comprehensive legislative scheme" requires the treatment of certain minor-perpetrators as victims—in accordance with *Tobias*. (Cf. *People v. Hillhouse* (2003) 109 Cal.App.4th 1612, 1619 ["although common parlance (even that indulged in by courts) tends to suggest that minors cannot consent to sexual contact, none of the statutory provisions which specifically govern that contact says any such thing. To the contrary, the concept of consent, whether legal or actual, is actually *irrelevant* to the determination of whether those statutes have been violated"].)

§ 18259.3 [defining a CSEC as any sexually exploited person under the age of 18 who has been detained *solely based on* a violation of subdivisions (a) or (b) of Section 647 [lewd conduct/prostitution], or subdivision (a) of Section 653.22 of the Penal Code [loitering with intent to commit prostitution].)

M.V. may well be correct that changing public policy will ultimately lead to the complete decriminalization of all prostitution activity engaged in by minors. Until the Legislature acts to clarify its intent with respect to these vulnerable youth, however, we are compelled to conclude under existing statutes and precedent that M.V. was legally able to form the requisite intent to engage in an act of prostitution. Thus, the evidence was sufficient to support the charge to which she admitted in the juvenile court, loitering in a public place with the intent to commit prostitution in violation of section 653.22 of the Penal Code.

B.   *Factual Basis for Admission*

M.V. also contends that there was an insufficient factual basis to support her admission on the loitering charge. Pursuant to rule 5.778(f)(6), when a juvenile court accepts an admission, it must make a finding that there is a factual basis for that admission. This requirement is analogous to the procedure for taking a conditional plea in an adult criminal case pursuant to section 1192.5 of the Penal Code. (Pen. Code, § 1192.5 ["If the court approves of the plea . . . [t]he court shall also cause an inquiry to be made of the defendant to satisfy itself that the plea is freely and voluntarily made, and that there is a factual basis for the plea"]; see also *Ricki J., supra,* 128 Cal.App.4th at pp. 791-792 [minor's admission of a juvenile court petition is analogous to a guilty plea in an adult criminal matter]; *In re Jermaine B.* (1999) 69 Cal.App.4th 634, 640 [principles underlying section 1192.5 with respect to plea bargains imported into juvenile delinquency proceedings].) The purpose of the factual basis finding is to protect against a situation where the juvenile, while realizing what he or she has done, is not sufficiently skilled in law to recognize that those acts do not constitute the offense charged. (See *People v. Palmer* (2013) 58 Cal.4th 110, 112 (*Palmer*).) A juvenile court's finding that there is a factual basis for a plea is reviewable for abuse of discretion. (*People v. Holmes*

(2004) 32 Cal.4th 432, 442-443 (*Holmes*).)  Any error in the factual basis inquiry will be deemed harmless if the record otherwise supports the factual basis finding.  (*Id.* at p. 443.)

In the present case, prior to accepting M.V.'s admission on the loitering charge, the juvenile court confirmed that the minor had previously talked with her attorney about the pending charges and the consequences of those charges.  Additionally, the court asked the minor to admit in open court that she had violated section 653.22 of the Penal Code, loitering with the intent to commit prostitution, on or about October 19, 2012, which the minor did.  M.V. was also advised of her trial rights and expressly waived those rights.  M.V.'s delinquency counsel then indicated that he consented to the minor's admission, and both he and the District Attorney stipulated that there was a factual basis for the plea.  However, the attorneys' stipulation did not reference any document or other evidence establishing the existence of a factual basis.  Nevertheless, the juvenile court subsequently accepted the minor's admission and found that there was a factual basis for it.

Respondent argues that M.V. has forfeited her right to challenge the factual basis for her loitering charge because she did not object to the lack of a factual basis in the court below.  Noting that a claim questioning the factual basis for a plea is "fundamentally equivalent" to an attack on the sufficiency of evidence, the Sixth District in *Voit* concluded that a guilty plea forecloses appellate review of the factual basis for that plea.  (*Voit, supra,* 200 Cal.App.4th at pp. 1365-1366.)  In contrast, the Third District, in *People v. Marlin* (2004) 124 Cal.App.4th 559, 571-572, characterized the factual basis inquiry as a procedural safeguard and found that a challenge to that procedure was cognizable on appeal.  We need not, however, resolve the *Voit/Marlin* dispute regarding the scope of appellate review for a factual basis finding in this case. (Compare *Palmer, supra,* 58 Cal.4th at p. 115 [declining to reach *Voit/Marlin* issue].)

Generally speaking, a bare stipulation, without reference to supporting evidence in the record, has been deemed inadequate to establish the factual basis for a plea.  (See, e.g., *People v. Willard* (2007) 154 Cal.App.4th 1329, 1333-1335; *People v. Tigner* (1982)

33

133 Cal.App.3d 430, 435.) Such was the situation in this case. However, any such error will be deemed harmless where the contents of the record otherwise supports a factual basis finding. (*Holmes, supra,* 32 Cal.4th at p. 443; *People v. Watts* (1977) 67 Cal.App.3d 173, 182.) Here, the documents contained in the record and available to the juvenile court judge at the time of the plea—the 602 petition, Probation's intake report, and the related police report—supply the factual basis necessary to support M.V.'s admission. As we have previously discussed at length, these materials disclosed evidence sufficient to support the loitering charge to which M.V. admitted in the juvenile court. Thus, even if appellate review of M.V.'s factual basis claim is permitted and error assigned, any such error was harmless.

## C.    *Ineffective Assistance of Counsel*

M.V.'s final argument—that her 602 counsel was ineffective for failing to raise the meritorious issues that she has identified on appeal—is easily dismissed given our previous holdings in this matter. The due process right to effective assistance of counsel extends to minors in juvenile delinquency proceedings. (*Timothy J. v. Superior Court* (2007) 150 Cal.App.4th 847, 857.) To demonstrate that she received ineffective assistance of counsel, M.V. "bears the two-pronged burden of showing that [her] counsel's representation fell below prevailing professional norms and that [she] was prejudiced by that deficiency." (*In re Angel R.* (2008) 163 Cal.App.4th 905, 909, citing *Strickland v. Washington* (1984) 466 U.S. 668, 694.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Before permitting a guilty plea, counsel does have a duty to confer with his or her client about all available defenses of fact and of law. (*People v. McCary* (1985) 166 Cal.App.3d 1, 9.) However, "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." (*Hill v. Lockhart* (1985) 474 U.S. 52, 59.)

Here, we have concluded that there was a factual basis for M.V.'s plea and have specifically held that, under current law, the 15-year old minor was legally capable of forming the intent to engage in prostitution. We have also opined that the juvenile court did not abuse its discretion in adjudging M.V. a ward and that the minor's status as a CSEC did not mandate a particular dispositional outcome. Thus, the issues raised by M.V. on appeal were not likely to have succeeded at trial, and their lack of merit provides a more than satisfactory explanation as to why counsel did not press them in the court below. No attorney is required to raise unmeritorious arguments "simply to 'create a record impregnable to assault for claimed inadequacy of counsel.' " (*In re Angel R., supra,* 163 Cal.App.4th at p. 910, citing *People v. Weston* (1981) 114 Cal.App.3d 764, 780.) M.V.'s delinquency counsel was not ineffective.

## IV. DISPOSITION

The judgment is affirmed.

_____
Reardon, J.

We concur:

_____
Ruvolo, P.J.

_____
Rivera, J.

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Rhonda Burgess |
| Counsel for Appellant: | Linda K. Harvie |
| | First District Appellate Project |
| Counsel for Respondents: | Kamala D. Harris |
| | Attorney General of California |
| | Dane R. Gillette |
| | Chief Assistant Attorney General |
| | Gerald A. Engler |
| | Senior Assistant Attorney General |
| | Eric. D. Share |
| | Supervising Deputy Attorney General |
| | Christina Vom Saal |
| | Deputy Attorney General |

*In re M.V.,* A137348