Filed 3/9/23  In re C.C. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | H048866 (Santa Clara County Super. Ct. No. 19JV43875E) |
| THE PEOPLE, Plaintiff and Respondent, v. C.C., Defendant and Appellant. | |

C.C., the minor, appeals following a disposition hearing in which the juvenile court committed the minor to the Santa Clara County Juvenile Rehabilitation Facilities—Enhanced Ranch Program (the ranch) for six to eight months.  The minor contends that the juvenile court erred by:  (1) denying her request to be treated as a dependent under Welfare and Institutions Code section 300;[1] (2) denying the "motion to dismiss for improper venue"; and (3) committing the minor to the ranch.  Finding no error, we affirm the order.

## I.  Factual Background

On July 20, 2019, officers with the San Francisco Police Department responded to Bloomingdales at Westfield Mall after a report of a strong-arm robbery.  E.S., the victim, and three of her friends were confronted by a group of 10 juveniles, which included the

---

[1] Undesignated references are to the Welfare and Institutions Code.

minor, who was 14 years old at the time. At some point, the minor shoved E.S. to the ground and an unknown juvenile stole E.S.'s fanny pack containing her cell phone. E.S. was struck numerous times while on the ground.

On September 5, 2019, San Francisco police officers responded to a report of criminal threats. L.C., the victim, reported that the minor and a group of juveniles had threatened and attempted to fight her outside of school.

On September 9, 2019, the San Francisco County District Attorney filed petition A against the minor, alleging robbery (count 1; Pen. Code, § 211), aggravated assault (count 2; Pen. Code, § 245, subd. (a)(4)), and making a criminal threat (count 3; Pen. Code, § 422).

The minor's mother was contacted, and she reported that the minor had run away from home several months earlier. According to the mother, the minor was living with her "auntie" in San Francisco. The mother was "disappointed" in her daughter's criminal involvement and "wants her home."

On September 25, 2019, the minor was remanded into custody at juvenile hall after she sent threatening messages to L.C. via social media. The probation report recommended that the minor remain detained in San Francisco County Juvenile Hall and that the matter be transferred to Santa Clara County because that was the county of her legal residence. The San Francisco County Juvenile Court ordered that the minor remain in home detention with her mother in San Jose.

At a jurisdictional hearing on September 30, 2019, the San Francisco County Juvenile Court sustained count 2 of petition A. The court also transferred the matter to Santa Clara County for disposition because that was the county of the minor's and the mother's legal residence.

On October 22, 2019, the minor appeared in Santa Clara County Juvenile Court with her mother and attorney. The juvenile court accepted the transfer, placed the minor on electronic monitoring, and issued a restraining order that the minor not contact E.S. by

2

any means.  The court warned the minor that if she violated the restraining order, "it is a new charge" and "[y]ou will get locked up in the hall."

On November 5, 2019, the Santa Clara County Juvenile Court declared the minor a ward of the court and placed her on probation.  The minor was ordered to continue electronic monitoring, participate in wraparound services, abide by a curfew, and have no contact with any of the victims or associate with her co-assailant.

On March 3, 2020, the minor appeared before the Santa Clara County Juvenile Court after the minor had a disagreement with her mother.  After the incident, the probation department temporarily placed the minor with her paternal aunt, A.C., in San Francisco.  The mother indicated to probation that she "would like to surrender her parental rights" but opposed her daughter residing with A.C. because "she believes she is not an appropriate caretaker."  The probation department later reported that the minor had initially adjusted well to living with A.C., but that once the Covid-19 shelter in place order took effect, the minor's responsiveness to the probation department and services offered "significantly declined."

On April 25, 2020, the minor left A.C.'s residence following an argument regarding curfew.  On April 29, 2020, the minor's mother submitted a missing person report to the San Francisco Police Department after viewing a video online of her daughter being assaulted on public transportation.  Based on the minor's whereabouts being unknown, a probation warrant was issued on May 4, 2020.  The Santa Clara County District Attorney thereafter filed petition B, alleging the minor violated the terms of her probation (§ 777).

On May 31, 2020, San Francisco police officers responded to a call regarding a teenager threatening to stab her mother.  Upon arrival, officers encountered the minor, who was then 15 years old, and the mother.  The minor was "extremely upset and yelled and cursed at everyone on scene."  Although the minor was taken into custody, the San Francisco County District Attorney declined to file a new petition "to allow Santa Clara

3

County the opportunity to address the [minor's] behavior." The court later referred the minor for an assessment under section 241.1, to determine whether she should be considered a dependent or a ward of the juvenile court.

On June 30, 2020, the Santa Clara County Department of Family and Children's Services (DFCS), Dually Involved Youth (DIY) unit became involved in the minor's case. In an interview conducted by the DIY unit, A.C. stated that the minor "was coming and going as she pleased." A.C. indicated she would contact police if the minor returned. The minor later returned and apologized for her actions.

On July 16, 2020, the minor and the mother participated in a child and family team (CFT) meeting. The minor stated she wanted to remain with A.C. and affirmed that she understood the rules and expectations. The mother stated she was willing to participate in reunification services provided by DFCS, and she was "adamant" that the minor be removed from A.C.'s care and placed in a group home.

On July 27, 2020, the minor and two other individuals entered an H&M clothing store in San Francisco to steal merchandise. During the incident, the minor twice brandished pepper spray at the store manager and left the store with unpaid merchandise.

On July 31, 2020, A.C. reported to the DIY unit that the minor had become argumentative and brandished a razor blade. The minor's belongings were placed on the porch, and she was picked up by friends. A.C. stated that "she will no longer allow the [minor] to return home," and that the minor was "reported AWOL" on that date.

On August 3, 2020, the H&M store manager called the San Francisco police to report that the minor had entered the store and had been stealing from the store "every day for the past week and a half." The minor was arrested and transported to San Francisco County Juvenile Hall. The minor was released on August 5, 2020, to A.C.'s custody after the mother refused to pick up the minor. However, the minor "immediately absconded" and her whereabouts were unknown.

4

On August 6, 2020, the Santa Clara County District Attorney filed petition C, alleging that the minor committed robbery (Pen. Code, § 211) on August 3, 2020, and that she absconded from her current placement on August 5, 2020.

On September 5, 2020, Bay Area Rapid Transit (BART) police officers responded to a reported robbery at the Fruitvale station in Oakland. The complaining witnesses stated two young women had followed them into the station and robbed one of the victims of her purse. Officers apprehended the minor and she was taken to Alameda County Juvenile Hall.

On September 9, 2020, the Alameda County District Attorney filed petition D, alleging robbery of a transit passenger (Pen. Code, § 211).

On September 18, 2020, the Alameda County Juvenile Court sustained the robbery of a transit passenger charge and ordered the matter transferred to Santa Clara County for disposition.

On September 23, 2020, the minor was admitted in-custody to Santa Clara County Juvenile Hall. Also on that date the Santa Clara County District Attorney filed petition E, alleging robbery by means of force or fear (Pen. Code, § 212.5) against the H&M store manager on July 27, 2020.

On September 25, 2020, the Santa Clara County Juvenile Court accepted the transfer of petition D from Alameda County. The court also ordered the minor detained in custody based on her previous violation of a court order, for her "own protection," and "there is a reasonable necessity for protection of persons and property." Defense counsel indicated that A.C. was still "ready and willing" to house the minor. However, the court responded, "unfortunately that doesn't seem to be working." The court noted that the section 241.1 assessment was still ongoing. Defense counsel then requested a CFT meeting between the minor and her mother "in recognition that perhaps her mother is the only local family that she has." The court refused that request, stating, "I find the mother exceedingly inappropriate, and I do not think it is appropriate to send [the minor] back to

5

her under any circumstances." A.C., who was present, then stated she could accept the minor. The court responded, "we've got to figure out how to do it so she doesn't run away and rack up new charges." The court requested that probation work with DFCS to find a suitable place for the minor to live.

On October 13, 2020, the Santa Clara County Juvenile Court held a hearing which addressed the section 241.1 report prepared jointly by the Santa Clara County Probation Department and the DIY unit. The court stated it agreed with the report's recommendation that the minor should proceed only as a ward of the juvenile court because "she does not appear to be described by Welfare and Institutions Code [section] 300 at this time." The court continued the matter until the next hearing.

On October 19, 2020, the Santa Clara County Juvenile Court held a contested jurisdictional hearing on petition E. Defense counsel initially moved to dismiss the petition for "improper venue," arguing that the crime had been committed in San Francisco and the minor had been living with A.C. in San Francisco at the time. The juvenile court denied the motion.

After hearing testimony regarding the robbery of the H&M store on July 27, 2020, the juvenile court found true the charge alleged in petition E and the violation of probation alleged in petition C. The prosecutor requested confinement to the ranch. At the conclusion of the hearing, the juvenile court allowed the probation department the discretion to release the minor to D.W., the minor's 23-year-old cousin and A.C.'s daughter, until a disposition hearing could be held to determine whether ranch placement was appropriate.

In a report prepared in advance of the disposition hearing, the probation department reported that the minor was in "positive spirits" following admission to Santa Clara County Juvenile Hall on September 23, 2020. The report also noted that D.W. was willing to house the minor. Finally, the report noted that the minor's mother did "not want to terminate her parental rights as she [was] hopeful for [her daughter] to receive the

6

help she needs to modify her delinquent behavior." The minor's mother was also "frustrated with the Court, as her daughter's safety has been jeopardized in the care of [A.C.], as her high-risk behaviors escalated in San Francisco and Alameda County." The report recommended continued detention, as a release from custody "would be a high-risk to the safety of the community." While the report noted that D.W. represented a "supportive young adult" for the minor, given her "young age and . . . proximity to [A.C.]," the probation officer was concerned the minor would return to "the same neighborhood and associates" as before.

On October 28, 2020, the Santa Clara County Juvenile Court held a hearing primarily addressing custody status. At the outset of the hearing, the court stated it was "impressed" with the work of the Young Women's Freedom Center with the minor and "the . . . people who are here to support [the minor]," and that it was "leaning in the direction of releasing her to her cousin [D.W.]." The probation officer then provided an update, stating that the mother was "adamant" that she did not want the minor residing with D.W. and that if the court was inclined to release the minor from custody, the mother was willing to take her in. The court noted that the mother's comments were "a 180 degree turn" from what she last said in court regarding what "she want[ed] to do about her parental rights." The probation officer stated that the mother's previous comments came from "frustration of what has occurred in court," and "she has not gone back to saying those statements at all." The prosecutor echoed this, stating, "those statements came from a point of frustration with a system that was taking her daughter out of her custody" and putting her in a position where she "continu[ed] to get in trouble" in increasingly serious ways.

The probation officer recommended that the minor be placed at the ranch. The prosecutor agreed, stating that the minor has shown she will say "things when she feels like it might benefit her." He added that D.W.'s residence was "down the street from [A.C.]," who the court had already determined "shouldn't have custody of the minor."

7

Defense counsel opposed ranch placement. She stated the minor was the "only young woman in juvenile hall," "this is no longer a rehabilitative situation," and that the ranch would be similarly isolating. She characterized the "level of isolation for a young person" as "unacceptable," especially when the minor has family who will support her.

At the conclusion of the hearing, the juvenile court placed the minor at D.W.'s residence. The court indicated to the minor, "I'm taking a risk on you," but "I believe that you have the capacity to be a good person and do well." The court set a status hearing for November 4, 2020.

On December 1, 2020, the parties appeared in the Santa Clara County Juvenile Court.[2] The prosecutor stated, based on recent information, the minor "was not in touch" with A.C. or D.W. and that "she was doing what she felt like doing." The prosecutor also stated that she had learned that the minor "was recently in the [H&M] store stealing [again] and that other charges might be forthcoming" soon. The matter was continued without a decision.

The probation department drafted an updated report on the minor's progress. According to A.C., the minor had "been 'coming and going' as she pleases" and that it was "too much" for D.W. to handle. In addition, the H&M manager reported that the minor had committed additional thefts, entering the store on November 11 and 13, 2020, and leaving with unpaid merchandise. The manager stated both incidents were "recorded on video surveillance" and she was " '110% positive' " it was the minor.

On December 15, 2020, the Santa Clara County District Attorney filed a petition alleging a violation of probation (§ 777) based on the recent allegations of theft from the H&M store in San Francisco.

---

[2] The parties appeared before Judge Katherine Lucero because Judge Franklin Bondonno, who previously had handled the case, was ill. At the conclusion of the hearing, Judge Lucero declined to determine the appropriate placement, stating she would continue the matter so that Judge Bondonno could decide the matter.

On December 16, 2020, the Santa Clara County Juvenile Court held a hearing to consider restitution on petition A and contested disposition of petitions C, D, and E. At the outset, the court noted it had previously "continued this matter to see if [the minor] can pulls things off on her own or if she needs something more structured." The prosecutor informed the court it had just filed a violation of probation based on two recent thefts at the H&M store in San Francisco. The court responded that it "seems . . . she should be remanded into custody today because the deal was" either she "be perfect or the Court intended to send her to the ranch, and unfortunately, it doesn't sound like this has been working." Defense counsel contended that the minor needed support, noting she was only 15 years old and her record reflected 23 "incidences reported to DFCS from the age of one years old." The court responded that the probation department had previously recommended commitment to the ranch, but the court "thought it was worth giving her an opportunity to see if she could pull this off on her own."

The juvenile court then asked the probation officer whether electronic monitoring was possible, or whether she had investigated any other short-term placements. The probation officer responded that she had not explored placement because "at the time [the minor] made it clear that wherever she was placed, she was going to do what she wanted to do and leave so that her behaviors were a concern for a placement setting."

At the conclusion of the hearing, the juvenile court adopted the probation department's recommendation to commit the minor to the ranch for six to eight months.

The minor timely appealed.

## II. Discussion

### A. *Dependency Designation*

The minor argues that the juvenile court erred by declining to treat her as a dependent under section 300, and instead treating her only as a ward of the court.

9

### 1. *Factual background*

The Santa Clara County Probation Department, along with the DIY unit of the DFCS, jointly prepared a section 241.1 report regarding the minor. The 16-page report reviewed the minor's child welfare history, juvenile justice involvement, current circumstances (including education, substance use, functioning at school, and parental/guardian involvement), as well as history of engagement with services and other available services to assist the minor.

Regarding the minor's child welfare history, the report listed 20 child welfare referrals, which included "Absence/Incapacity," "General Neglect," "Emotional Abuse," and "Physical Abuse." The conclusions of these 20 referrals were either: "Evaluated Out/Information Only for Outcome"; "Inconclusive"; or "Unfounded." The report also included three substantiated referrals for general neglect and caretaker absence from 2006, 2013, and 2014, with summaries of the incidents. In 2006, the minor and her siblings were placed with their paternal great grandparents after the minor's father was arrested on gun charges. The children were found to be "safe and well cared for" by the great grandmother and the referral was closed. In 2013, the minor's older sister reported that the maternal grandmother hit her on the back of the head and threatened to send her into foster care, and that the minor's father kept drugs in the home. The minor and her siblings were placed in protective custody. In 2014, the minor's mother gave birth to a premature baby and tested positive for barbiturates. A court case was opened, and child protective services became involved.

The report next described the minor's history with dependency court, noting that she had been placed in protective custody from December 2013 until August 2015. She was initially placed in a foster home until she was placed with a relative, where she remained until she returned home.

After reviewing the current charges pending against the minor, the report reviewed the minor's current circumstances. The report noted the minor had been "out of the

10

family home" since March 2020, "due to her violent temper and unwillingness to abide by house rules." The mother was reportedly "fearful" that the minor may physically harm the younger children in the home and wanted to protect them from potential violence. The report stated the minor was residing with her aunt, A.C., "however, she was not following curfew and would not return to the home for days at a time." A.C. initially refused to allow the minor to return, "but changed her mind after [the minor] returned home and apologized for her behaviors." A.C. later told the DIY unit she was no longer willing to care for the minor after she became argumentative, brandished a razor blade, and left with friends. The report stated that during discussions with the mother it was "evident she loves her daughter tremendously and wants her to return home, safely." However, the mother was "torn" between the minor's behaviors and protecting her younger children. The mother continued to maintain contact with the DIY unit for frequent updates on the minor's well-being. The father was reported to be serving a prison sentence for gun charges and was subject to an active five-year restraining order.

The report noted that extensive efforts had been made to locate relatives to take custody of the minor. The probation officer reported conducting an interview with the minor about placement options. The minor reportedly stated regarding placement, no matter where it is, "she is 'going to get up and leave.' " The mother reported that the minor had " 'burned bridges' with her extended family members." The report detailed numerous unsuccessful attempts at reaching members of the minor's extended family. Only D.W. and A.C. reported being willing to house the minor.

Regarding the minor's education status, the report stated the minor was currently in ninth grade at Osborne School within juvenile hall, that she was actively participating, and that she was fully engaged according to unit staff. According to a prior probation report, the minor had previously "received failing grades in all of her courses and

accumulated numerous disciplinary actions for fighting," resulting in suspensions and expulsions.

Regarding the minor's substance use, the minor reported that she and her friends drank alcohol on " 'special occasions' " and smoke marijuana daily. She first tried marijuana when she was 10 years old, she said she likes marijuana because it "makes her feel happy," and denied using any other substances. The mother expressed concern about the minor's "recent substance use as she has been on the 'streets' of San Francisco under [A.C.]'s care."

The report discussed the minor's history of services and available services. The report noted the minor had received "Wraparound Services with Seneca Connections via the Juvenile Probation Department," but that these services were closed "due to the [minor's] Warrant status." Upon her return, the minor was unwilling to participate "as she felt overwhelmed with said services." The minor's behavioral health therapist indicated the minor was " 'very engaged' with her sessions and would benefit from ongoing treatment to address prior trauma and anger issues."

In conclusion, the report recommended that it was in the minor's best interest "to proceed in Juvenile Justice pursuant to [section] 602 WIC" and remain "in detention in Juvenile Hall." The report noted a "concern" with the minor's "continued violent and aggressive behavior" while released. Based on her inability to "stabilize in her aunt's care," the report reasoned that "release from Juvenile Hall would be a high risk to the safety of the community and to the youth herself." The mother and the DIY team were "hopeful" that with proper services, the minor could return to the mother's care. Concluding that the minor "does not come within the description of . . . section (WIC) 300," the report recommended that the minor "will be best served through the Juvenile Justice System."

On October 13, 2020, the Santa Clara County Juvenile Court considered the section 241.1 report. The court noted it was "glad to see" a "couple of things" noted in

12

the report.  First, the court noted that "they were able to run down at least one person who looked like they might be willing to help you, and I was pleased about that."  Second, the court noted that the minor was "doing well" in school.  And third, the court observed "that you seemed to be receiving some services that are a help right now."

Addressing the substance of the report, the juvenile court noted that the report "talks about the mother's tremendous love for her daughter and desire for her safety."  While the court agreed that the desire for safety was "clear," the court stated, as to the other conclusion, "my interactions [with the mother] have been different than the social worker's and my perception's different."  Defense counsel noted that the mother "had repeatedly stated to multiple people that she wanted to terminate her parental rights."  Counsel then noted "[t]here are 20 DFCS referrals including very recent ones," but the report only includes the subject matter of the referrals for the substantiated reports.  Counsel then attempted to clarify the minor's statement to probation that "she would run where [ever] she was placed."  Counsel stated that the minor meant that statement to apply "with regard to going back to her mother," not "with regard to staying with other family."  The court responded that it "appreciate[d] that clarification" since the court had taken note of the minor's comment.

The prosecutor argued that the minor should be placed at the ranch because "the minor needs structure."  The prosecutor noted that "wherever [the minor's] gone, whether it's with the aunt or not, she's out committing new crimes.  And what we need to do . . . for the minor's sake is to break that pattern and the People absolutely believe that the only thing that's going to even help and then we can worry about where we're going to place her after that."  Defense counsel opposed ranch placement, arguing that the minor "needs a supportive and loving home where she can also engage in probation services in order to have that structure."

The juvenile court declined to designate the minor a dependent of the court.  The court stated that it understood the arguments, and it asked the probation department to

investigate placement with D.W., the minor's cousin in San Francisco. The court stated that it hoped to "find a way forward for you that's the least restrictive I can and at the same time a way forward that protects society and from you getting into any trouble."

### 2. *Standard of review*

"A child who has been abused or neglected falls within the juvenile court's protective jurisdiction under section 300 as a 'dependent' child of the court. In contrast, a juvenile court may take jurisdiction over a minor as a 'ward' of the court under section 602 when the child engages in criminal behavior." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1505 (*M.V.*).) In general, a "child cannot be both a dependent and a ward of the court." (*In re Ray M.* (2016) 6 Cal.App.5th 1038, 1048 (*Ray M.*).) "In cases where a child qualifies as both a dependent and a ward of the juvenile court, section 241.1 sets forth the procedure the juvenile court must follow to determine under which framework the case should proceed." (*Ibid.*)

"Under section 241.1, subdivision (a), when it appears a minor fits the criteria for both dependency under section 300 and wardship under section 601 or 602, 'the county probation department and the child welfare services department shall . . . initially determine which status will serve the best interests of the minor and the protection of society.' " (*Ray M.*, *supra*, 6 Cal.App.5th at p. 1048.) "The assessment of a minor under section 241.1 is statutorily required to include, at a minimum, consideration of the following eight factors: (1) the nature of the referral; (2) the age of the minor; (3) the prior record of the minor's parents for child abuse; (4) the prior record of the minor for out-of-control or delinquent behavior; (5) the parents' cooperation with the minor's school; (6) the minor's functioning at school; (7) the nature of the minor's home environment; and (8) the records of other agencies that have been involved with the minor and his or her family. (§ 241.1, subd. (b)(2).)" (*M.V.*, *supra*, 225 Cal.App.4th at p. 1506.)

"This statutory mandate has been augmented by [California Rules of Court,] rule 5.512,[3] which requires the joint assessment under section 241.1 to be memorialized in a written report." (*M.V.*, *supra*, 225 Cal.App.4th at p. 1506.) Rule 5.512 requires consideration of four additional items: "(1) the history of any physical, sexual, or emotional abuse of the child; (2) any services or community agencies available to assist the child and his or her family; (3) a statement by any counsel currently representing the minor; and (4) a statement by any court appointed special advocate (CASA) currently appointed for the child." (*M.V.*, at p. 1506.) "Once the recommendations of both departments are presented to the juvenile court, it remains for the court to 'determine which status is appropriate for the minor.' " (*Ibid.*)

"We review the juvenile court's determination under section 241.1 for abuse of discretion. [Citation.] 'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.' [Citation.] Throughout our analysis, we will not lightly substitute our decision for that rendered by the juvenile court. Rather, we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them." (*M.V.*, *supra*, 225 Cal.App.4th at pp. 1506-1507.)

### 3. *The juvenile court did not abuse its discretion by not designating minor a dependent under section 300*

Here, the record reflects that the juvenile court acted within its discretion in declining to treat the minor as a dependent under section 300. At the conclusion of the section 241.1 hearing, the juvenile court determined, in accord with the probation department and DFCS, that the minor should be treated solely as a ward of the court. The section 241.1 report and the juvenile court appropriately considered the factors outlined in section 241.1, subdivision (b)(2), which outlined the minor's increasingly serious

[3] Undesignated rule references are to the California Rules of Court.

criminal behavior, the unsuccessful interventions, and her placements with relatives. Based on an analysis of the statutorily outlined factors and the report, the court determined that the minor would be most appropriately treated as a ward of the court. In our view, the report and the juvenile court's acceptance of the report's recommendation reflected an analysis of the appropriate factors, and we discern no abuse of discretion in the decision process.

The minor argues that the section 241.1 report was inadequate under the statute. She contends that the report lacked agency records and substantive reports of child welfare referrals. She identifies the list of 20 child welfare referrals, and notes that documentation was not included from the agencies involved in these referrals. She also faults the report for only summarizing the substantiated findings, rather than providing the records underlying those referrals. Here, the minor's characterization of the report is largely correct. It is not clear, however, whether these omissions were the result, as the Attorney General suggests, of there being "little to no documentation" for the unsubstantiated referrals, or whether they were available but not included. To the extent that the report appears to omit some of the underlying records, assuming this was error, we must evaluate prejudice.

" 'When [an individual] challenges an assessment report as inadequate, the reviewing court evaluates any deficiencies in the report in view of the totality of the evidence in the appellate record.' " (*M.V.*, *supra*, 225 Cal.App.4th at p. 1511.) Thus, deficiencies in a section 241.1 report are generally reviewed for harmlessness under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818. In *M.V.*, the court considered a challenge to the section 241.1 assessment based on the report's failure to adequately address at least four areas required by statute and/or court rule. The court concluded that any error was not reversible error: "Here, since the vast majority of the evidence that the minor complains was lacking in the 241.1 assessment was before the

16

court from other sources, any technical deficiencies in the assessment were harmless." (*M.V.*, *supra*, at p. 1511.)

In this case, we find any technical deficiencies regarding possible reports related to the child abuse referrals to be harmless. The record shows that the juvenile court was well apprised of the minor's history as it relates to child abuse allegations. The issue was specifically addressed at the section 241.1 hearing, with defense counsel specifically noting the long history of referrals. Defense counsel also specifically highlighted recent issues involving the minor's mother and issues involving relative placement. In context, the court was certainly made aware that the minor's home life was challenging. As for the list of substantiated referrals, the summaries were sufficiently detailed to inform the juvenile court of the nature and severity of the allegations. Any technical deficiencies in not including the underlying records were harmless under the applicable standard.

Next, the minor challenges the court's ruling, contending that it "failed to consider the factors enumerated in section 241.1 and [rule 5.512]." She notes that the court did not explicitly consider several factors listed in section 241.1. This argument is unavailing. The section 241.1 report analyzed the required factors, and the juvenile court stated on the record that it had considered and read the report. Under these circumstances, we must presume that the court's decision was informed by all the factors enumerated in the report. While a court is required to state its reasons on the record or in a written order (see rule 5.512(g)), the minor identifies no requirement that the court must address *every* factor orally in stating its reasons.

The minor next identifies what she characterizes as "the final and most significant error in the court's analysis," namely, the juvenile court failed to account for the mother's apparent abandonment of the minor. She notes that the mother "literally [came] into court on multiple occasions seeking to terminate her parental rights." As with the minor's prior argument, however, this issue was clearly presented to the juvenile court. At one hearing, the court noted that the mother said she wanted to terminate her parental

17

rights "[o]n several occasions." The court was clearly troubled by the mother's statements. The section 241.1 report, however, stated the mother did "not want to terminate her parental rights," and that her statements to the court were born of frustration with the court and her daughter's safety. Thus, evidence of the mother's intent to terminate parental rights was not uncontradicted. To the extent this evidence weighed in favor of treating the minor as a dependent, the juvenile court evidently considered it in the context of the case as a whole and concluded it did not warrant a dependency designation. We will not substitute our judgment for the juvenile court's weighing of this evidence.[4] (*M.V.*, *supra*, 225 Cal.App.4th at pp. 1506-1507.)

## B. *Residency of Minor*

The minor contends that the juvenile court erred in denying her "motion to dismiss for improper venue."[5] She contends that under applicable law, her county of residence was San Francisco, and therefore the matter should have been heard in San Francisco County.

### 1. *Background*

On October 19, 2020, at a contested jurisdictional hearing on petition E, defense counsel moved to dismiss the petition for improper venue, arguing that the crime had been committed in San Francisco and the minor had been living with A.C. in San Francisco at the time. The juvenile court found that venue was appropriate in Santa Clara County and denied the motion. The court reasoned, "I have reviewed the Welfare and

---

[4] Having addressed the minor's arguments on the merits, we do not address her claim that counsel rendered ineffective assistance by failing to object to the court's ruling.

[5] We note that the purported "motion to dismiss for improper venue" is a misnomer, as the proper procedure in juvenile court when "a petition is filed in the juvenile court of a county other than the residence of the person named in the petition" is to file a motion to transfer the petition to that county. (§ 750; see rule 5.610.) Thus, we construe the motion as requesting that the matter be transferred to San Francisco County based on the minor's residency.

18

Institutions Code, specifically Section 775. My analysis comes down to this: We place[d] [the minor] with her relative in San Francisco. The crime occurred in San Francisco; however, her mother lives [in Santa Clara County]. And right now, although her mother has stated on the record she wants to give up her rights, she hasn't done that yet. And even the [section] 241.1 report simply said[,] keep her in the juvenile justice system, but it didn't change her venue where she lives. So I think the motion is properly denied."

### 2. *Standard of Review*

As relevant here, under section 17.1, "[u]nless otherwise provided under the provisions of this code, to the extent not in conflict with federal law, the residence of a minor person . . . shall be determined by the following rules: [¶] (a) The residence of the parent with whom a child maintains his or her place of abode or the residence of any individual who has been appointed legal guardian or the individual who has been given the care or custody by a court of competent jurisdiction, determines the residence of the child. [¶] (b) Wherever in this section it is provided that the residence of a child is determined by the residence of the person who has custody, 'custody' means the legal right to custody of the child unless that right is held jointly by two or more persons, in which case 'custody' means the physical custody of the child by one of the persons sharing the right to custody. [¶] (c) The residence of a foundling shall be deemed to be that of the county in which the child is found. [¶] (d) If the residence of the child is not determined under subdivision (a), (b), (c), or (e), the county in which the child is living shall be deemed the county of residence, if and when the child has had a physical presence in the county for one year. [¶] (e) If the child has been declared permanently free from the custody and control of his or her parents, his or her residence is the county in which the court issuing the order is situated."

"The proper interpretation of section 17.1 is . . . a question of law [that] we review de novo." (*In re R.D.* (2008) 163 Cal.App.4th 679, 686.) However, "residency is simply

19

one factor in determining whether to transfer the case for disposition." (*In re Carlos B.* (1999) 76 Cal.App.4th 50, 55 (*Carlos B.*).) "The court may not transfer the case unless it determines that the transfer will protect or further the child's best interests." (Rule 5.610(e)(2).) We will uphold a ruling denying transfer absent a clear showing of an abuse of discretion by the juvenile court. (*Maribel M. v. Superior Court* (1998) 61 Cal.App.4th 1469, 1478.)

### 3. *The juvenile court did not err in denying the motion to dismiss for improper venue*

The minor contends that the juvenile court erred in denying her motion to dismiss for improper venue, which in essence sought to have the matter heard in San Francisco County. However, the minor fails to articulate any prejudice resulting from having the matter decided in Santa Clara County Juvenile Court. "No judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const. art. VI, § 13.) Indeed, in the context of dependency cases, "the California Supreme Court has cautioned against using the structural error doctrine," explaining that the concept of automatic reversal was developed in criminal cases involving errors affecting fundamental fairness. (*In re A.D.* (2011) 196 Cal.App.4th 1319, 1326.) Without a claim of prejudice from the decision, the minor's complaint amounts to one of procedural error, which is insufficient to warrant reversal of the disposition order. Moreover, "it is clear that jurisdiction is not dependent upon a determination of residency," and therefore notwithstanding the minor's residency claims, the Santa Clara County Juvenile Court had jurisdiction to conduct a disposition hearing. (*Carlos B.*, *supra*, 76 Cal.App.4th at p. 55.)

In addition, the minor's claim also fails on the merits. A minor's residence is defined by section 17.1, which provides a series of successive rules for determining residence. First, it provides "[t]he residence of the parent with whom a child maintains

his or her place of abode *or* the residence of any individual who has been appointed legal guardian *or* the individual who has been given the care or custody by a court of competent jurisdiction, determines the residence of the child." (§ 17.1, subd. (a), italics added.) Subdivision (b) of section 17.1 states that " 'custody' " means "the legal right to custody of the child unless the right is held jointly by two or more persons, in which case 'custody' means the physical custody of the child by one of the persons sharing the right to custody." At the time of the relevant petition, the minor's mother had sole custody of the minor. The mother's statements about terminating parental rights had no effect on her custody. As the juvenile court recognized, "although the mother has stated on the record she wants to give up her rights, *she hasn't done that yet*." (Italics added.) While A.C. had been granted legal authority over the minor's education, this was not equivalent to a grant of custody or legal guardianship. Under the plain meaning of the statute, the mother's residence determined the residence of the minor.

In addition, section 755 permitted the Santa Clara County Juvenile Court to retain jurisdiction over the minor even after she lived in San Francisco for parts of 2019 and 2020. Under section 755, in relevant part, "Any person placed on probation by the juvenile court or adjudged to be a ward of the juvenile court may be permitted by order of the court to reside in a county other than the county of [her] legal residence, and the court shall retain jurisdiction over such person." The minor was permitted to reside in San Francisco after being adjudged a ward of the court, having been placed there by the Santa Clara County Juvenile Court. That placement did not alter the minor's county of residence. Accordingly, the minor's placement in San Francisco did not divest the Santa Clara County Juvenile Court of jurisdiction over the matter, and the juvenile court did not abuse its discretion by declining the transfer request.

### C. *Placement Decision*

The minor argues that the juvenile court abused its discretion by placing her at the ranch.

21

### 1. *Standard of Review*

We review a juvenile court's decision committing a minor to a detention facility for abuse of discretion.  (*In re Nicole H*. (2016) 244 Cal.App.4th 1150, 1154.)  An abuse of discretion occurs when a decision falls outside the boundaries of what is allowed by the applicable law or when there is no reasonable basis for the court's action.  (*Sargon Enterprises*, *Inc*. *v*. *University of Southern California* (2012) 55 Cal.4th 747, 773.)  If factual findings critical to the court's decision are not supported by substantial evidence, that would constitute an abuse of discretion.  (*Nicole H*., at p. 1154.)  But "[a]n appellate court will not lightly substitute its decision for that rendered by the juvenile court."  (*In re Michael D*. (1987) 188 Cal.App.3d 1392, 1395.)

We evaluate the propriety of a juvenile placement decision in light of the purpose of the juvenile court law, which is set forth in section 202.  (*In re Jose T*. (2010) 191 Cal.App.4th 1142, 1147.)  Section 202, subdivision (a) states that the purpose "is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public."  Minors must be provided with the care, treatment and guidance that is in their best interest, but any such services must also be "in conformity with the interests of public safety and protection." (§ 202, subd. (b).)  Juvenile courts are required to "consider the safety and protection of the public" when administering the juvenile court law (§ 202, subd. (d)), and the allowable sanctions for punishing a minor include commitment "to a local detention or treatment facility, such as a juvenile hall, camp, or ranch."  (§ 202, subd. (e)(4).)

### 2. *The juvenile court did not abuse its discretion by placing minor at the ranch*

We find no abuse of discretion in the juvenile court's decision to commit the minor to the ranch program for six to eight months.  The record showed that the minor committed multiple violent robberies over the course of a year and was unwilling or

unable to follow the orders of the court, the terms of her probation, or the rules established by her placement relatives. The court repeatedly attempted to make placement with relatives work in lieu of the ranch program, but ultimately those attempts failed. The court was therefore well within its discretion to conclude that confinement at the ranch was required to protect the safety of the public and serve the rehabilitative needs of the minor.

The minor contends that the juvenile court erred by not explicitly considering less restrictive placement options before ranch placement. We disagree. A court does not "abuse its discretion by ordering the most restrictive placement before other options have been tried," and the relevant statutes do not require a "gradual 'ramping up' of placement alternatives" from least to most restrictive. (*In re Eddie M*. (2003) 31 Cal.4th 480, 507.) Rather, "[t]he statutory scheme governing juvenile delinquency is designed to give the court 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' " (*In re Greg F*. (2012) 55 Cal.4th 393, 411.) It is clear from the record that the court did *consider* the possibility of placement alternatives, as it was required to do (see *In re Teofilio A*. (1989) 210 Cal.App.3d 571, 577), before deciding to commit the minor to the ranch. At the hearing, the court asked the probation officer about a "six-month short term placement, like one of the schools?" The probation officer said that she did not explore placement there because the minor "made it clear that wherever she was placed, she was going to do what she wanted to do and leave," which made such placement inappropriate. The court thus considered the possibility of placement alternatives, but ultimately concluded that the ranch program was the most appropriate option based on the minor's needs. Although the minor stated through her attorney that she meant to say she would only leave her mother's custody, the minor's behavior while placed with family in San Francisco contradicted this statement and supported the probation officer's assessment.

On the record before us, we find that the juvenile court appropriately exercised its placement discretion and no abuse of that discretion has been demonstrated.

### III.  Disposition

The disposition order is affirmed.

_____
                    Wilson, J.


WE CONCUR:




_____
      Bamattre-Manoukian, Acting P.J.




_____
           Danner, J.




People v. C.C.
H048866