Filed 12/23/25  In re A.J. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.J. et al., Persons Coming Under the Juvenile Court Law. | B342504 (Los Angeles County Super. Ct. No. 24CCJP03159A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. I.J., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Cathy J. Ostiller, Judge.  Affirmed in part, dismissed in part.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, I.J. (father) challenges dispositional orders made by the juvenile court.  In particular, father argues substantial evidence does not support the court's order removing his daughter and son from his care.  Father also argues the juvenile court abused its discretion when it ordered monitored visits with his children.

After father filed his appeal, the juvenile court terminated jurisdiction and ordered unmonitored visits for father, including overnight visits.  Thus, the visitation issue father raises on appeal has been rendered moot.  As to the removal order, we find no error and affirm.

## BACKGROUND

**1.     The Family**

Father and A.W. (mother) have been together as a couple for 15 years and married for five of those years.  They have two children, A.J. (daughter) and I.J. (son).  When the underlying proceedings began, daughter was ten years old and son was four years old.  Mother has an older adult daughter, S.C. (half sister), from a different relationship.  Although father is not half sister's biological parent, he considers her his biological child and "practically raised her as his."

Although mother and father were married, they did not live together.  Mother lived with daughter, son, and half sister.  Father visited them at home a few times a week and sometimes stayed the night.  Mother explained father did not live with them "because she is currently under Section 8, and father is not on the

2

contract." According to mother, father "bounces" between different homes of relatives and friends.

Father joined a gang when he was a teenager. However, for the past year or more, father, now in his thirties, had been "staying away from the gang life" and was "focused on being a family man."

**2. Events Preceding Petition**

In August 2024, father was arrested after he physically assaulted mother. The children were home during the altercation. Son was asleep but daughter and half sister witnessed some of the incident. Half sister called 911 prompting father to leave the home. Soon after, mother heard a gunshot from outside. Daughter saw father in the alley outside the home shoot a gun approximately two times into the air.

Mother reported to the responding officers that father had strangled her by grabbing her neck, pinning her against a door and lifting her off the ground. Father held mother's neck for five to six seconds, during which time she could not breathe. Daughter also reported seeing father pin mother to the wall with both of his hands on mother's throat. Half sister saw father push mother into a staircase railing outside the apartment when mother tried unsuccessfully to call police. Mother and daughter both reported father headbutted mother two times in the head. Daughter said this caused mother to fall backward in the chair on which she was sitting. Mother told the officers this was not the first incident of domestic violence. Mother declined an emergency protective order.

The officers apprehended father nearby. Father acknowledged his actions and expressed regret, stating " 'I shouldn't have put my hands on her.' " When questioned about the gun, father stated both, " 'I tossed it, I gave it to a friend' " and " 'I don't carry guns no more.' "

A few days after the incident, the criminal court issued a criminal protective order protecting mother and daughter from father.

The Los Angeles County Department of Children and Family Services (Department) opened an investigation. One week after the altercation, a Department social worker spoke with mother. Recalling the incident, mother stated "everything happened so fast" and "was a bit of a blur." She felt it was her fault because she had angered father. She explained they were experiencing financial stress and that night she was irritated and tired. She said "she took out her stress and frustration on father." Although mother confirmed father had "put his hands around her neck and pinned her into the door," she said she could breathe and did not lose consciousness. Mother also clarified she believed father accidentally bumped into her head and did not headbutt her. She said daughter did not appear scared during the incident, but daughter did cry afterward because father had been taken to jail. Mother did not believe the incident impacted daughter because it was the only time she had seen domestic violence at home.

Although mother confirmed she heard a gunshot after father left the home, she noted there were "always shootings in the area, so it could have been anyone." Mother told the social worker father did not own a gun and she had never seen him with a gun. She said father was not an angry or violent person and this was the first time she had seen him so upset. Mother was not afraid of father and was not concerned for the children in his care. She denied previous domestic violence incidents with father and denied reporting that there had been earlier incidents. She also denied an October 2023 incident that appeared in 911 call logs indicating police responded to her home after a call was made that included "male in background

4

screaming/threatening/violent struggle heard then line disconnected."

Mother participated in a three-hour interview for a family preservation assessment.  The counselor who conducted the interview "did not find any unusual or adverse outcomes." However, she reported mother minimized the level of domestic violence.  It was noted, "Mother appears to minimize and overlook the severity of violence demonstrated by father; and the traumatic impact this may have had on the children."  Although mother identified the August altercation as the only incident of domestic violence, an assessment summary also referenced the Department referral which stated there was a history of domestic violence.  The assessment summary stated the parents were complying with the criminal protective order but mother "expects to reunite ASAP" and "plans to reunify with father ASAP."

The Department social worker also spoke with father. Father acknowledged he was wrong to grab mother by the throat but he did not believe the incident was as severe as had been reported.  He indicated he and mother were under financial stress, which exacerbated the situation and made it different from past arguments.  Father explained mother had referenced a rival gang during their argument, which father interpreted as a threat to his life.  He said he did not intend to hurt mother.  He denied headbutting, choking, or hurting her.  He denied grabbing her throat with any force or pressure.  Instead, father said he grabbed mother by the throat and pinned her against the wall because he was trying to get mother's attention "for her to stop." He said it was a "one time incident," mother could breathe, and she did not lose consciousness.

Father also consistently denied owning a gun or firing one into the air.  He said he did not own weapons because he was not allowed to after being arrested in 2022 on a gun charge.  Father

explained he told law enforcement on the night of the incident he gave the gun to a friend because he wanted law enforcement to stop interrogating him about the gun.

Father acknowledged daughter, son, and half sister were present when the incident took place. He said half sister told him and mother to stop arguing and that they should not be fighting in front of the children. He did not know if daughter or son witnessed the incident. He did not believe the incident affected the children.

After being released from jail on bail, father stated he was "bouncing around" between relatives' homes. He indicated he could not stay with his mother (paternal grandmother) because "there is no space available" there. Father was "open to cooperating with the Department" and willing to participate in services. He did not want to violate the criminal protective order.

The social worker also spoke with daughter one week after her parents' domestic violence incident. Daughter described what she witnessed, stating "father was slightly picking up mother by the neck." She told the social worker she was scared and screamed at father, trying to get him to stop. As father was leaving the home, he said, " 'I'm going to kill myself.' " Father appeared in the alley outside their home, where daughter saw him shoot a gun into the air. Daughter "heard a pop." This was the second time daughter saw father with the gun. Daughter told the social worker that night was the first time daughter had heard mother and father argue. Daughter indicated she felt better and the incident had not affected her.

Approximately one week after the social worker first spoke with daughter, daughter asked to meet again with the social worker. When they met for a second time, daughter changed her statement about seeing father with a gun. She told the social worker she had not seen father shoot a gun into the air.

6

Daughter explained she felt pressured to say that on the night of the altercation when law enforcement responded to the home. The social worker noted daughter's body language was different during their second meeting. The first time they spoke, daughter "appeared relaxed, calm, and happy" whereas daughter "appeared tense, nervous, and monotone" during their second visit. However, daughter denied anyone had asked her to change her statement.

The social worker also spoke with half sister. Half sister did not witness the entire altercation. She came out of her room to tell mother and father to stop fighting and that they should not be arguing like that in front of the children. Half sister called 911 from the bathroom. She had heard mother and father argue before, "but nothing like this night." She did not see father pick mother up by the neck or headbutt mother. Half sister did not hear a gunshot that night and had not seen father with a gun.

The social worker also spoke with paternal grandmother and a paternal aunt. The paternal grandmother said she saw the children every day and cared for them while the parents worked. Paternal grandmother was "very close" with mother and father. She said this was the first domestic violence incident between them and it "shocked" her. Paternal grandmother believed mother and father had learned from the incident and that father was remorseful. She also mentioned the financial pressure the family was experiencing. She believed father picked up "bad habits and morals" from his friends and would benefit from parenting and anger management classes. The paternal aunt told the social worker she saw the family once a week. She believed mother and father's recent altercation was their first domestic violence incident.

Daughter and half sister both reported having a good relationship with father. Daughter felt safe with father and said

she had "a tight knit" and "strong" relationship with him.  She called herself " 'daddy's girl.' "  Half sister said "father is an amazing father" and "he basically raised her."  Half sister said father was "a good father to the children," cared for them, and did "everything for them."  Mother similarly said father was an "amazing" and "loving" father.  Paternal grandmother believed father was an attentive, affectionate, and protective father.  She had no safety concerns for the children.  Similarly, the paternal aunt said father was an "amazing" father and "very loving and attentive" toward the children.  The paternal aunt described father as a "calm person" and not aggressive.  She had no safety concerns for the children.

Mother and father agreed to attend marriage counseling and to live separately for the time being.  They agreed to a safety plan, which required them to comply with the criminal protective order and allowed monitored contact between father and son (whom the protective order did not cover).  Father told the social worker he and mother had agreed to fix and work on their marriage.

In September 2024, father entered pleas of nolo contendere to three misdemeanor charges stemming from the domestic violence incident.  The criminal court found father guilty of those charges and sentenced him to probation.  The criminal court ordered father to complete a domestic violence treatment program, an anger management program, community labor, and a gun safety course.  The court also entered a three-year criminal protective order, again protecting mother and daughter from father.  The new criminal protective order allowed father to have "peaceful contact" with mother and daughter in order to facilitate visitation or exchange of children in compliance with a family, juvenile, or probate court order.  By late September 2024, father reported he was participating in domestic violence and anger

8

management classes.  The family appeared to be abiding by the criminal protective order.

In early October 2024, the juvenile court denied the Department's request for an order removing the children from father.  The court determined the Department had not shown there was no reasonable means to protect the children without removal from father.  The court pointed to the existing criminal protective order and the parents' compliance with that order.

## 3.    Petition

In October 2024, the Department filed a two-count Welfare and Institutions Code section 300 petition on behalf of daughter and son.[1]  The two counts of the petition were brought under subdivisions (a) and (b) of section 300.  Both counts alleged father's domestic violence against mother put the children at risk of harm.  The subdivision (b) count also alleged the children were at risk of harm due to mother's failure to protect.

The Department asked the juvenile court to detain the children from father.  The Department noted not only did mother and father minimize the severity of their domestic violence incident and the impact it had on the children, but they also intended to reconcile once the protective order expired.  Although mother and father had been abiding by the criminal protective order, the Department did not believe that was sufficient to mitigate identified risks because son was not protected by the order.  The Department argued monitored visits with father would maintain the children's relationship with father.

At the initial hearing on the petition, over father's objection, the juvenile court detained the children from father.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

9

The children were released to mother under Department supervision. The court granted father monitored visits with the children.

4. **Further Investigation**

In early November 2024, a few months after the domestic violence incident, a Department social worker again spoke with mother. Mother reiterated what she previously had reported about the August domestic violence incident. In some respects, however, she adjusted her description. For example, mother was not sure if father had lifted her off the ground when he grabbed her by the throat and pinned her to the door. She also clarified father " 'did . . . more of a push type of choke' as he pushed her away with his hands on her neck but did not hold on to her." She said father caused no marks or bruises and, although " 'it probably felt like' " she could not breathe while father was choking her, she explained she " 'was hysterical' " and " 'probably over exaggerated *[sic]* at the time.' " Mother said they had never had an argument like that before. She said daughter confided she was trying to protect mother when she told law enforcement father had a gun. Mother said daughter told her she did not see a gun that night.

Mother was not fearful of father, did not think he would hurt her again, and believed he had "learned his lesson." She said, " 'I want to be with my husband for sure. I love him. I know he love *[sic]* me.' " Mother described father as " 'a great father,' " a " 'protector,' " and " 'a great husband.' "

The social worker also spoke again with daughter in early November 2024. Daughter could not think of anything she would want to change about her parents. Daughter told the social worker she had not seen father since the domestic violence incident but, before that, she saw him " 'a lot.' " When asked about the domestic violence incident, daughter stated she did

10

"not recall the incident" and did not remember how she felt during the incident.  Daughter said, " 'I think I was worried about my mom, my dad.  Because I don't like them getting into arguments.' "  She had never seen or heard "incidents" between mother and father before.

The social worker also spoke with mother's sister (maternal aunt).  Maternal aunt recounted what mother had told her concerning the domestic violence incident.  According to maternal aunt, mother stated father put his hands around her throat, " '[s]he blacked out and thought her life was going to end.' "  Maternal aunt also stated mother told her father had slapped mother six months earlier.  Maternal aunt did not want mother to reunite with father "given she nearly lost her life."  She believed mother took the situation seriously.  Nonetheless, maternal aunt had no abuse or neglect concerns regarding either parent.

The social worker spoke with father as well.  Father again expressed regret for his actions, took responsibility, and said he had learned a lesson.  However, father continued to state he neither choked nor headbutted mother.  Nonetheless, and despite previous denials, father admitted he had a gun that night.  He insisted, however, he did not shoot it in the air.  He explained he carried a gun for protection.  He also acknowledged saying he was going to harm himself that night.  Father was not sure how the domestic violence incident affected the children.  He believed daughter was " 'distraught' " without him physically there for emotional support.  Contrary to maternal aunt's statement, father denied slapping mother six months earlier.  As of November 2024, father did not have a permanent home and was "couch surfing."

Father wanted to work on his marriage and reunite with mother.  He took pride in being a father and a husband.  He said,

11

" 'I know we can make this work.' " Father stated this was their first domestic violence incident and they already "kind of moved past it" because they had been able to share messages with one another through paternal grandmother. Father worried the dependency case was keeping the family separated and making things harder on mother. He said, " 'I'm not doing my fatherly duties' " and mother had to do everything on her own. Father described mother as " 'the gel for our family' " and " 'very supportive' " of father.

In its Jurisdiction and Disposition report, the Department asked the juvenile court to continue court supervision over the family, maintain the children's removal from father and placement with mother, and continue monitored visits for father. Among other things, the Department was concerned that daughter had recanted portions of her description of the domestic violence incident and later could not remember any details of the event, mother and father wanted to reconcile, and mother and father both minimized the domestic violence they admitted occurred as well as denied previous incidents despite reports to the contrary.

## 5. Adjudication and Disposition

A combined adjudication and disposition hearing was held on November 18, 2024. As to adjudication, counsel for the children as well as counsel for the Department argued the court should sustain the petition. It was undisputed the domestic violence incident occurred and, given reports of previous less-severe altercations between the parents, counsel for the children expressed concern the domestic violence was escalating. Counsel for the Department further noted father minimized the severity of the incident. Counsel also explained the Department did not oppose mother and father reunifying. However, the Department

12

wanted to be sure "they do so in a manner that's safe for the children and that there will be no more domestic violence."

On the other hand, counsel for mother and counsel for father urged the court to dismiss the petition. Counsel for mother argued the August domestic violence incident was an isolated incident, the evidence to the contrary was insignificant, and there was no current risk to the children given father's criminal case and related protective order. Counsel for father argued the children were not scared of father, father had never been aggressive toward the children, and there was no current risk to the children because of the criminal court's involvement.

After hearing argument, the juvenile court sustained the petition. The court noted the severity of the domestic violence and found there was "at least . . . some prior domestic violence in this family." The court further found the Department had shown current risk in the combination of the parents' strong and laudable desire to reunify and the short amount of time that had elapsed since father began his criminal court programs. The court wanted to be "satisfied that father has resolved his issues."

As to disposition, counsel for father asked the court to release the children to father with a safety plan or, at the least, grant him unmonitored visits with the children. Counsel reiterated father had never been aggressive toward the children and the August domestic violence incident was "somewhat of an isolated incident." Counsel also stated although the parents wanted to reunify, there were no immediate plans to move in together and they were abiding by the criminal protective order.

Counsel for the Department, on the other hand, argued the court should not yet release the children to father. Counsel believed "this is without a doubt a reunification case and without a doubt the children will be going back to the father as long as he stays on track." Counsel noted the relatively short amount of

13

time (three months) between the August domestic violence incident and the disposition hearing.  Counsel argued the juvenile court needed more time "to feel assured that things really have calmed down and things really are fine."  Counsel for the children noted daughter wanted to be released to both parents, but counsel could not recommend that and submitted on the Department's recommendations.

The juvenile court declared daughter and son dependents of the court under subdivisions (a) and (b) of section 300.  The children were removed from father's custody and care and were released to mother.  The court explained that it based its removal order on the severity of the domestic violence at issue, that it likely was not the first incident between the parents, the fact the children were present during the incident, and father's minimization of the incident.  The court believed father needed "more time in his programs before it is safe to place the children with him."  The juvenile court ordered father to complete a 52-week domestic violence program and granted father monitored visits with the children.  The Department was given discretion to liberalize his visits.

## 6.    Appeal and Post-Appeal Orders

Father appealed the juvenile court's November 18, 2024, orders.

Almost one year later, on October 24, 2025, the juvenile court determined its jurisdiction was no longer necessary.  The court granted sole physical custody of the children to mother and joint legal custody to both parents.  Father was granted unmonitored visitation with the children, including overnight visits.  The court stayed termination of its jurisdiction pending receipt of the final custody order.  On October 28, 2025, the

14

juvenile court received and filed the final custody order and terminated its jurisdiction.[2]

**DISCUSSION**

**1.     Removal**

**a.     Applicable Law and Standard of Review**

When a child has been adjudged a dependent of the court within the meaning of section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if necessary to protect the child.  (§ 361, subd. (a)(1).) Subdivision (d) of section 361 provides in part, "A dependent child shall not be taken from the physical custody of their parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody."  The juvenile court must both determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home" and "state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e).)

" ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.

---

[2] We grant the Department's October 30, 2025, motion for judicial notice, through which the Department sought judicial notice of the juvenile court's October 24, 2025, orders.  On our own motion, we take judicial notice of the juvenile court's October 28, 2025, orders.

15

The focus of the statute is on averting harm to the child." ' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).)  In making its determination, the juvenile court may consider the parent's past conduct, present circumstances, and "the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

We review the juvenile court's removal order under the substantial evidence standard of review, bearing in mind the heightened burden of proof by clear and convincing evidence. (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012; *In re I.J.* (2013) 56 Cal.4th 766, 773; *In re A.F.* (2016) 3 Cal.App.5th 283, 292; see *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)  "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

>    **b.    Substantial evidence supports the removal order.**

Father argues substantial evidence does not support the juvenile court's order removing the children from his custody.  Specifically, father contends substantial evidence did not support a finding either that there would be a substantial danger of harm to the children if released to him,  or that there were no reasonable alternatives to removal.  We are not persuaded.

16

Father highlights evidence that weighs against the juvenile court's decision to remove the children from his custody. For example, father generally responded well to the juvenile court's intervention. He was cooperative, had enrolled in domestic violence treatment and anger management programs as required by the criminal court, and showed some insight into his actions. He and mother were abiding by the existing criminal protective order. Father expressed love for and dedication to his children as well as remorse and accountability for the domestic violence against mother. Father also notes there was a lack of evidence that he was a violent person generally.

On the other hand, however, other evidence supports the juvenile court's decision to remove the children from father. As father does not challenge the jurisdictional findings, it is undisputed father violently attacked mother, causing her to be unable to breathe while he pinned her against a door and choked her and then headbutted her twice. Moreover, father had a gun with him the evening of the domestic violence incident, a fact about which he lied repeatedly only later to admit he did in fact have a gun with him that night. In addition, the children were present during the altercation, during which daughter was scared, screaming and, without success, begging her parents to stop fighting. On his way out of the home, father declared that he was going to kill himself, then he shot his gun into the air in the alley outside, all of which daughter heard and witnessed. The severity of the incident cannot reasonably be disputed.

Despite the severity of the domestic violence incident, father downplayed aspects of it. He insisted, for example, that he did not apply force or pressure when he grabbed mother's neck with both of his hands but was only trying to get her attention "for her to stop." He also denied headbutting mother, although mother and daughter both said otherwise when describing the

17

incident to law enforcement. Although father denies it, the juvenile court considered the evidence and found the August 2025 incident was not the first domestic violence incident between mother and father, although it was the most violent. By continuing to minimize the incident, father revealed a lack of understanding of the seriousness of the matter. As the juvenile court and Department indicated below, only three months had passed between the domestic violence incident and the disposition hearing. It was reasonable for the juvenile court to determine father needed more time to participate in his programs before it was safe to release the children to him.

In effect, father asks us to reweigh the evidence. This we cannot do. " 'The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.)

Father also argues it was internally contradictory for the juvenile court to allow the children to remain with mother but not with him. We do not see it that way. Although, as father correctly points out, mother also minimized the domestic violence incident and played a role in escalating the argument, she was not the aggressor, was not arrested, and was not criminally convicted. Another distinction between mother and father is mother had a stable home for the children while father "bounced around" from place to place. On appeal father suggests the Department should have considered releasing the children to him on the condition he live with paternal grandmother, who was a great support to the family, or another paternal relative. However, father stated below there was no space for him (let alone for two children) at paternal grandmother's home, and it stands to reason that the fact he had to "bounce around" indicates

18

other homes also lacked the ability to house father and the children.  Father notes a lack of housing alone cannot support dependency jurisdiction or removal of a child from a parent.  While we take no issue with this general proposition, it does not require reversal here.  As discussed above, a lack of housing alone was not the court's reason for removing the children from father.

Father further asserts the Department failed to comply with its duty not only to explore alternatives to removal but also to include in its report for the court a discussion of reasonable efforts made to prevent removal of the children.  Father failed to raise these issues below and, therefore, has forfeited them.  (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1508.)  Accordingly, we need not consider these arguments.

Finally, father relies on *In re I.R.* (2021) 61 Cal.App.5th 510 to support his position.  As the Department states in its respondent's brief, that case is factually distinct and unpersuasive here.

On record before us, which includes an incident of severe domestic violence, father's minimization of that incident, previous incidents of domestic violence, and the short amount of time father had spent in his criminal court programs, it was not unreasonable for the juvenile court to remove the children from father.  Bearing in mind the applicable clear and convincing standard below, we conclude substantial evidence supports the removal order.

## 2.    Monitored Visitation

Although on appeal father also challenges the juvenile court's order of monitored visitation, this issue has been rendered moot.  "An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief."  (*In re*

19

*Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054.)  After father appealed the juvenile court's November 18, 2024, orders, the court terminated jurisdiction and granted father unmonitored visitation including overnight visits.  We agree with the Department that we cannot provide effective relief to father on this issue as it has been resolved.  Although discussed by the Department in its respondent's brief, father did not address the issue of mootness in his reply brief on appeal.  We conclude father's challenge to the order of monitored visitation is moot.

## DISPOSITION

We dismiss as moot that portion of father's appeal challenging the juvenile court's November 18, 2024, order of monitored visitation.  The juvenile court's November 18, 2024, removal order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


SIGGINS, J.*

---

\* Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.